[No. B221057. Second Dist., Div. Four. Mar. 1, 2011.]

SCOTT TAMKIN et al., Plaintiffs and Respondents, v.
CBS BROADCASTING, INC., et al., Defendants and Appellants.

**136**

COUNSEL

White, O'Connor, Fink & Brenner, Andrew M. White, David E. Fink and Tami Kameda for Defendants and Appellants.

Glassman, Browning, Saltsman & Jacobs, Anthony Michael Glassman and Rebecca Nell Kaufman for Plaintiffs and Respondents.

OPINION

MANELLA, J.—

## INTRODUCTION

CBS Broadcasting, Inc., and Sarah Goldfinger (collectively defendants or appellants) appeal from the denial of their special motion to strike pursuant to

Code of Civil Procedure section 425.16, also known as the anti-SLAPP (strategic lawsuit against public participation) statute.[1] After independently reviewing the record, we conclude that the trial court erred in denying the anti-SLAPP motion. Accordingly, we reverse and remand with instructions to grant the anti-SLAPP motion.

## FACTUAL AND PROCEDURAL HISTORY

In 2005, Goldfinger met Scott and Melinda Tamkin (collectively, the Tamkins, plaintiffs, or respondents) when she was in the process of buying a home. The Tamkins, married real estate agents who lived in Los Angeles, represented the seller of a home on which Goldfinger had made an offer. After Goldfinger's offer was accepted, she exercised her right to cancel the transaction because an inspection revealed the property would require extensive remediation.

Goldfinger was one of the writers for the popular CBS television show, *CSI: Crime Scene Investigation* (*CSI*), which is set in Las Vegas, Nevada. According to defendants, each episode of *CSI* is "written collaboratively, through multiple drafts, with input from executive producers, the studio and the network." "The process moves quickly, with shows typically written and filmed within weeks." The process is as follows: "First, executive producers assign writers to work on an episode. . . . Once an outline is approved, the writers work on preliminary drafts of an initial script. . . . Typically, there are . . . very early drafts of the initial scripts which are circulated internally among the production staff: the 'Preliminary Writers' Draft,' the 'Writers' Draft,' and in some cases, the 'Revised Writers' Draft' (collectively, the 'Writers' Drafts'). . . . The next draft, for broader distribution, is the 'First Draft.' "

"Early Writers' Drafts are kept confidential, shared only amongst the producers and writers of each episode. [Citation.] When necessary due to time constraints, the casting staff receives Writers' Drafts to begin the process of casting guest roles prior to filming. An outside service prepares 'breakdowns,' or short written synopses of the characters, for use during casting. [Citation.] Each script undergoes a legal clearance process before it is produced, generally before the First Draft is distributed, to ensure that names and places used by [*CSI*] do not infringe on anyone's rights. [Citations.] As part of that vetting, all character names are changed if they match real-life individuals."

In fall of 2008, Goldfinger and Corinne Marrinan were assigned to write *CSI* episode 913 (season 9, 13th episode). Their proposed story line about a

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise noted.

murder in a fast-food restaurant was approved as the main story—the "A" story, but the executive producer wanted a separate story involving a second crime—a "B" story. The executive producer and the writers hammered out the concepts of the "B" story. It would involve a married couple in the real estate and/or mortgage businesses, one of whom would commit suicide by overdosing on fluoride.

Goldfinger used Scott and Melinda Tamkin as the names of the married real estate couple in the early writers' drafts for episode 913. Within six days of the completion of the preliminary writers' draft, and before the first draft was broadly disseminated, the legal clearance process was completed, and the characters' names in the "B" story were changed to Scott and Melinda Tucker.

In the interim, however, an "incomplete preliminary draft" of episode 913 was sent to Breakdown Services, Ltd. (Breakdown Services), by CBS casting staff, and Breakdown Services was requested to break down the roles in the draft. One of the writers for Breakdown Services then created casting synopses based upon the preliminary draft, including the following two synopses:

"[SCOTT TAMKIN] Mid to late-30's, this slick, attractive, hard-drinking extensive bondage/porn-watching man who's been a mortgage broker since college feels his world drop out from under him during the mortgage crisis. His clients have left him and his own house may be foreclosed on. He is a suspect in his wife Melinda's murder. . . . GUEST STAR.

"[MELINDA TAMKIN] Mid 30's, Scott's wife, she's attractive, athletic real estate agent. Unlike Scott, she didn't let the recent economic downturn freak her out. Melinda's death may have occurred during kinky sex in which she was handcuffed to the bed. . . . CO-STAR."

Breakdown Services sent the casting synopses to CBS casting staff for approval, and then "were given the authority to release it to talent representatives in Los Angeles." At some time during this process, the casting synopses were leaked and posted on various Internet Web sites, including to some "spoiler" Web sites discussing *CSI*. According to defendants, "[t]hese websites provide public forums for *CSI* fans to discuss all aspects of the show, including plot lines for upcoming shows."

Episode 913 was broadcasted on February 12, 2009. According to a ratings Web site, the show attracted 17.43 million viewers and was the most watched show that night. In episode 913, the married real estate couple, who lived in Las Vegas, was named Scott and Melinda Tucker. Scott and Melinda were

portrayed by Caucasians, who did not wear glasses and looked like they were in their mid-30's, in good physical shape, and of normal height and weight. There was no indication that they had children. They were experiencing marital discord. Scott, a mortgage broker, was initially shown as being "wasted" or very drunk on the couch in the living room. He used high-fluoride toothpaste and was suffering from receding gums. He had recently watched bondage pornography. Scott was a suspect in his wife's death. Melinda was initially shown dead, handcuffed to the bed in the upstairs bedroom. A half-empty glass of wine and a pair of running shoes were also shown in the room. Melinda also used high-fluoride toothpaste and had been a dental hygienist prior to becoming a real estate agent. The couple was facing foreclosure on their home. When it was revealed that Melinda had committed suicide and had tried to frame her husband for murder, Scott suggested that Melinda framed him because she blamed him for the loss of their house and their friends, some of whom were clients who had taken out "ninja loans" through Scott and had lost their homes during the housing crisis.[2]

On May 22, 2009, Scott and Melinda Tamkin filed a complaint for defamation/defamation per se and false light invasion of privacy against defendants arising from defendants' alleged "intentional and reckless conduct with respect to the writing and dissemination of a screenplay." According to plaintiffs, "[a]fter Defendant Goldfinger was involved in a failed real estate transaction with Plaintiffs, Scott and Melinda Tamkin, she hijacked their complete names, physical characteristics, personal characteristics, marital relationship, ages and professions to craft, without their knowledge or consent, an episode of the global blockbuster *CSI: Crime Scene Investigation*. Defendant Goldfinger then proceeded to embarrass the Tamkins, and potentially damage the successful business relationships they have taken years to build, by creating from whole cloth characters engaged in a reckless lifestyle of sexual bondage, pornography, drunkenness, marital discord, depression, financial straits, and possibly even murder." (Italics added.) The Tamkins acknowledged that the names of Goldfinger's characters were changed during the actual broadcast of episode 913, but alleged that "the damage was clearly done because of the widespread dissemination on the internet" of casting synopses containing the Tamkins' names.

The Tamkins alleged that the casting synopses contained defamatory statements. They assert that it was defamatory to describe the Scott Tamkin character as a slick, hard-drinking, extensive bondage/porn-watching man who feels his world drop out from him during the mortgage crisis. It was also defamatory to state that "His clients have left him and his own house may be

---

[2] A copy of episode 913 was included in the record on appeal, and the relevant footage was viewed by this court.

foreclosed on. He is a suspect in his wife Melinda's murder." Similarly, it was defamatory to state that the Melinda Tamkin character's "death may have occurred during kinky sex in which she was handcuffed to the bed."

Defendants filed an answer, generally denying the allegations and raising the anti-SLAPP statute as an affirmative defense. On August 13, 2009, defendants filed an anti-SLAPP motion to strike the complaint. In their motion, they asserted that their conduct was protected activity and that plaintiffs could not establish a probability of prevailing on their claims. Goldfinger filed a declaration in support of the anti-SLAPP motion, and defendants filed a request for judicial notice of various newspaper articles and other documents.

In response, plaintiffs filed an ex parte application to take limited purpose discovery. Plaintiffs sought discovery on "general policies which CBS/CSI claim exist and are followed with respect to not using a real person's persona and description in their script and episode" and "their lack of authorization and responsibility for the spoilers." Plaintiffs deposed Goldfinger and a representative of Breakdown Services, Gary Marsh.

Goldfinger had asserted in her declaration that it was common in the industry to use real names as placeholders for the names of characters. During her deposition, she testified that she used real names as placeholders in "[m]ore than half" "of the hundred scripts or more that [she had] participated in." Because the show utilized numerous guest characters, she used this writing technique to remember the characters. Goldfinger did not note what names in the script were real names because she knew that the show had "standards and practices who clear all the names."

In this case, Goldfinger used Scott and Melinda Tamkin as placeholders for the married real estate characters because the Tamkins were the only married couple she knew in the real estate business. There was nothing unique, unusual, or distinctive about the Tamkins, such as their looks or personalities, that caused her to use their names. Goldfinger also testified that she did not research the Tamkins on the Internet or visit their Web site during the writing of the episode. She did not know that Melinda Tamkin was a runner, and she had no knowledge of the state of the Tamkins' marriage. Goldfinger testified that she did not provide pictures or physical descriptions of the Tamkins in connection with the casting of the characters. Once the episode was written, however, she did visit the Tamkins' Web site, along with the Web sites of other real estate agents, to assist the art and props departments.

Marsh, president of Breakdown Services, testified about the events related to episode 913. He also testified that there are security procedures in place at

his company to protect the confidentiality of the breakdowns. First, Breakdown Services verifies that the talent representative is a legitimate and licensed talent agency or a personal manager with the required letters of recommendation. Second, the talent representative is required to sign a contract containing specific confidentiality provisions. Third, the talent representative receives a unique login and password to access the Web site where the breakdowns are posted. Fourth, Breakdown Services does some monitoring to ensure that persons logging into their systems are legitimate. Finally, Breakdown Services has an "aggressive policy" to pursue all legal means to stop dissemination and copying of their materials.

After the depositions were completed, plaintiffs filed an opposition to the anti-SLAPP motion. Citing *Dyer v. Childress* (2007) 147 Cal.App.4th 1273 [55 Cal.Rptr.3d 544] (*Dyer*), they contended that defendants' conduct did not fall within the purview of the anti-SLAPP statute. They also asserted that they would prevail on their claims at trial. In support of the opposition, plaintiffs filed separate declarations. Scott Tamkin described how he discovered the allegedly defamatory statements while doing an Internet search of his name. He also noted that the actors' Web sites indicated that they would be portraying Scott and Melinda Tamkin, not Scott and Melinda Tucker. Similarly, a media database Web site also credited the actors with portraying Scott and Melinda *Tamkin*. Scott noticed the following similarities between the character Scott Tucker and himself during the broadcasting of the episode: they shared the same first name, were married to women named Melinda, had similar physical characteristics, appeared to be the same age, both worked in the real estate industry—although Scott Tucker was a mortgage broker while Scott Tamkin is a real estate agent, and both used prescription toothpaste for periodontal disease.

Melinda Tamkin filed a declaration stating that the character of Melinda Tucker in episode 913 shared the following similarities with her: same first name, married to a man named Scott, similar physical appearance and age, same occupation, and shared the hobbies of running and wine drinking.

Both Tamkins stated that they received 16 foreclosure notices on their home in the fall and winter of 2008 which were due to an error in the application of mortgage payments, and that they had marital problems in the fall of 2008. They stated that they believed that "our encounter with the writer was a typical real estate transaction." They are the parents of three young children.

Plaintiffs also filed evidentiary objections to the Goldfinger declaration and to defendants' request for judicial notice. On November 4, 2009, the trial court overruled plaintiffs' evidentiary objections to the Goldfinger declaration

and to defendants' request for judicial notice. The court denied defendants' anti-SLAPP motion on the basis that defendants' acts and conduct were not protected by the anti-SLAPP statute. The trial court did not address plaintiffs' probability of prevailing on their claims at trial.

## DISCUSSION

■ "A SLAPP suit—a strategic lawsuit against public participation— seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. [Citation.] The Legislature enacted . . . section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights. [Citation.]" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056 [39 Cal.Rptr.3d 516, 128 P.3d 713] (*Rusheen*).)

To determine whether a lawsuit or cause of action should be disposed of as a SLAPP suit, section 425.16 establishes a two-part test. Under the first part, the party bringing the anti-SLAPP motion has the initial burden of showing that the lawsuit, or a cause of action in the lawsuit, arises from an act in furtherance of the right of free speech or petition—i.e., that it arises from a protected activity. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802].) Once the defendant has met its burden, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the lawsuit or on the cause of action. (*Ibid.*) Only a cause of action that satisfies both parts of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703].) On appeal from an order denying an anti-SLAPP motion, the reviewing court independently determines whether both parts of the anti-SLAPP statute are met. (*Rusheen, supra*, 37 Cal.4th at p. 1055; *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645 [24 Cal.Rptr.3d 619].)

### A. *Whether Defendants' Conduct Arises from Protected Activities*

In their anti-SLAPP motion, appellants contended the acts that form the basis for plaintiffs' causes of action fall under the purview of the anti-SLAPP statute as "any other conduct in furtherance of the exercise of the constitu-tional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) We agree.

■ A cause of action arises from protected activity within the meaning of section 425.16, subdivision (e)(4) if (1) defendants' acts underlying the cause

of action, and on which the cause of action is based, (2) were acts in furtherance of defendants' right of petition or free speech (3) in connection with a public issue. (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1346 [63 Cal.Rptr.3d 798].) This court independently determines what acts form the basis for plaintiffs' claims. "[W]e focus on the specific nature of the challenged protected conduct, rather than generalities that might be abstracted from it." (*Dyer, supra,* 147 Cal.App.4th at p. 1279.) Here, defendants' acts on which the counts alleged in the complaint are based were the acts of using the Tamkins' names as placeholder names for a married real estate couple in the early writers' drafts, sending one of the early writers' drafts to Breakdown Services, approving casting synopses, approving the dissemination of the casting synopses to talent representatives, and broadcasting the episode after changing the last name of the real estate couple to Tucker.

█  Next, we determine whether defendants' acts are in furtherance of their exercise of the right of free speech. An act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right. (See *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 [1 Cal.Rptr.3d 536] ["*Furtherance* means *helping* to advance, *assisting.* [Citation.]"].) The creation of a television show is an exercise of free speech. (See *Winter v. DC Comics* (2003) 30 Cal.4th 881, 891–892 [134 Cal.Rptr.2d 634, 69 P.3d 473] [The 1st Amend. to the U.S. Const. protects the creative elements of an artistic work.].) Here, defendants' acts helped to advance or assist in the creation, casting, and broadcasting of an episode of a popular television show.

█  Finally, the acts must be in connection with a matter of public interest. "Section 425.16 does not define 'public interest,' but its preamble states that its provisions 'shall be construed broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).)" (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039 [72 Cal.Rptr.3d 210] (*Nygård*).) In *Nygård,* this court held that " 'an issue of public interest' . . . is *any issue in which the public is interested.* In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." (*Id.* at p. 1042.) Here, the creation and broadcasting of *CSI* episode 913 is an issue of public interest because the public was demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode.

Respondents contend, however, that defendants' acts are not connected to an issue of public interest. They rely in particular on *Dyer, supra,* 147 Cal.App.4th 1273. There, the writer used the plaintiff's real name for a

character in a film. The writer admitted the film character was based upon the plaintiff, whom she had known in graduate school. (*Id.* at p. 1277.) The court concluded that "the assertedly false portrayal of Dyer's persona in [the film was] not conduct in furtherance of defendants' exercise of their constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.* at p. 1276.) In reaching this conclusion, the court determined that "there is no discernable public interest in Dyer's persona." (*Id.* at p. 1280.)

We find *Dyer* distinguishable. The *Dyer* court did not address whether there was any public interest in the creative process underlying the production of the film. In contrast, defendants here asserted and showed that there was a public interest in the writing, casting and broadcasting of *CSI* episode 913. Defendants also demonstrated a connection between the use of plaintiffs' names and the creative process underlying episode 913—plaintiffs' full names were used as placeholders for guest characters who would appear on the show. Additionally, the *Dyer* court focused on the lack of a "discernable public interest in Dyer's persona." (*Dyer, supra*, 147 Cal.App.4th at p. 1280.) We believe the statutory language compels us to focus on the conduct of the defendants and to inquire whether that conduct furthered such defendants' exercise of their free speech rights concerning a matter of public interest. We find no requirement in the anti-SLAPP statute that the plaintiff's persona be a matter of public interest.

■ Accordingly, we conclude that defendants' conduct here arose from protected activities because defendants' acts were in furtherance of the exercise of their right of free speech in connection with an issue of public interest. In making this determination, we reject plaintiffs' argument that the ruling would "effectively negate" defamation and privacy actions with respect to popular entertainment defendants. Here, for example, defendants demonstrated that their challenged conduct was in furtherance of the creative process of developing and broadcasting *CSI*. Moreover, defamation and privacy claims that satisfy the second part of the anti-SLAPP statute—by showing even minimal merit—will still proceed. (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89.)

We also disagree that defendants' acts are not entitled to the protection of the anti-SLAPP statute because it was not necessary for Goldfinger to use real names as placeholders for guest characters when she could have created fictional names to use as placeholders. As stated in a different context, "[t]he creative process must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried, and, in the end, either discarded or used. . . . [¶] . . . We must not permit juries to dissect the creative process in order to determine what was

*necessary* to achieve the final product and what was not, and to impose liability . . . for that portion deemed unnecessary. Creativity is, by its nature, creative. It is unpredictable. Much that is not obvious can be necessary to the creative process." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 298 [42 Cal.Rptr.3d 2, 132 P.3d 211] (conc. opn. of Chin, J.) [addressing workplace sexual harassment claim]; see also *Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 869 [160 Cal.Rptr. 352, 603 P.2d 454] (conc. opn. of Bird, C. J.) ["Contemporary events, symbols and people are regularly used in fictional works. Fiction writers may be able to more persuasively, or more accurately, express themselves by weaving into the tale persons or events familiar to their readers. The choice is theirs. No author should be forced into creating mythological worlds or characters wholly divorced from reality." (fn. omitted)].)

B.  *Whether There Is a Probability That Plaintiffs Would Prevail on Their Claims*

■ Having determined that defendants met their burden of showing that their acts arose from protected activity, we next determine whether plaintiffs have met their burden of demonstrating a probability of prevailing on their causes of action. (*Zamos v. Stroud, supra*, 32 Cal.4th at p. 965.) In doing so, we consider the pleadings and the supporting and opposing affidavits filed by the parties on the anti-SLAPP motion. We do not weigh credibility or determine the weight of the evidence. Rather, we accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325 [46 Cal.Rptr.3d 606, 139 P.3d 2].)

■ Here, plaintiffs alleged a defamation cause of action. "Defamation constitutes an injury to reputation; the injury may occur by means of libel or slander. (Civ. Code, § 44.) In general . . . , a written communication that is false, that is not protected by any privilege, and that exposes a person to contempt or ridicule or certain other reputational injuries, constitutes libel. (Civ. Code, § 45; Rest.2d Torts, § 568, subd. (1).) A false and unprivileged oral communication attributing to a person specific misdeeds or certain unfavorable characteristics or qualities, or uttering certain other derogatory statements regarding a person, constitutes slander. (Civ. Code, § 46; Rest.2d Torts, § 568, subd. (2).)" (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242 [7 Cal.Rptr.3d 576, 80 P.3d 676], italics omitted.)

■ In order to prevail on a defamation claim, a plaintiff must show "publication." "In general, each time the defamatory statement is communicated to a third person who understands its defamatory meaning as applied to

the plaintiff, the statement is said to have been 'published,' although a written dissemination, as suggested by the common meaning of that term, is not required." (*Shively v. Bozanich, supra*, 31 Cal.4th at p. 1242.) Stated differently, "[i]n defamation actions[,] the First Amendment . . . requires that the statement on which the claim is based must specifically refer to, or be 'of and concerning,' the plaintiff in some way." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177].) In actions based on the identification of a fictional character with the actual plaintiff, "[t]he test is whether a reasonable person . . . would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described. [Citation.]" (*Bindrim v. Mitchell* (1979) 92 Cal.App.3d 61, 78 [155 Cal.Rptr. 29] (*Bindrim*).) Whether defamatory statements can reasonably be interpreted as referring to plaintiffs is a question of law for the court. (*Alszeh v. Home Box Office* (1998) 67 Cal.App.4th 1456, 1461 [80 Cal.Rptr.2d 16].)

Here, the complaint alleged that the defamatory statements about plaintiffs were made in *CSI* episode 913 and in the casting synopses posted on various Web sites. After reviewing the record, including viewing the broadcast of episode 913, we conclude that plaintiffs have not met their burden of demonstrating that a reasonable person would have understood that the fictional characters portrayed in episode 913 and in the casting synopses referred to them.

Plaintiffs asserted that the boldfaced terms in the casting synopses below are defamatory and therefore, by definition, are false:

"[SCOTT TAMKIN] Mid to late-30's, this **slick**, attractive, **hard-drinking extensive bondage/porn-watching** man who's been a mortgage broker since college **feels his world drop out from under him during the mortgage crisis. His clients have left him and his own house may be foreclosed on. He is a suspect in his wife Melinda's murder.** . . . GUEST STAR.

"[MELINDA TAMKIN] Mid 30's, Scott's wife, she's attractive, athletic real estate agent. Unlike Scott, she didn't let the recent economic downturn freak her out. **Melinda's death may have occurred during kinky sex in which she was handcuffed to the bed.** . . . CO-STAR."

Because defamatory statements are necessarily false, we must determine whether a reasonable person would understand from the remaining terms in the casting synopses that the synopses actually referred to plaintiffs. There is no single test for making this determination. "Each case must stand on its own facts." (*Bindrim, supra*, 92 Cal.App.3d at p. 78.)

In the casting synopsis, the fictional Scott Tamkin shares the same first and last name as the real Scott Tamkin. "However, as a matter of law,

mere similarity or even identity of names is insufficient to establish a work of fiction is of and concerning a real person. [Citations.]" (*Aguilar v. Universal City Studios, Inc.* (1985) 174 Cal.App.3d 384, 388 [219 Cal.Rptr. 891].) Plaintiffs alleged that the fictional and real Scott Tamkin worked in the real estate business, but admitted that the real Scott Tamkin is not a mortgage broker. The similarity in the occupational field is a factor, but not sufficient by itself to suggest that the fictional Scott Tamkin is in fact the real Scott Tamkin. Similarly, the facts that the writer had met Scott Tamkin and that Scott Tamkin was married to Melinda Tamkin could support a finding that the fictional Scott Tamkin was in fact the real Scott Tamkin, but is not sufficient by itself to do so. Plaintiffs further alleged that the real and fictional Scott Tamkin have similar ages and physical characteristics. The ages and physical characteristics, however, are described in very sparse terms—"Mid to late-30's" and "attractive"—which would apply to many male actors on television shows.

Furthermore, there is nothing about the physical description of the fictional Scott Tamkin, such as a special birthmark or a specific fashion accessory or hairstyle, which would allow a reasonable person to conclude that the fictional Scott Tamkin was in fact the real Scott Tamkin. (Cf. *Mitchell v. Globe Internat. Publishing, Inc.* (W.D.Ark. 1991) 773 F.Supp. 1235, 1238, 1240 [The defamatory statements included plaintiff's real-life picture.].) Nor does the synopsis include biographical references about the real Scott Tamkin—such as his birthplace, his parents, his children, or his schooling—that would assist a reasonable person in recognizing that the fictional Scott Tamkin was actually plaintiff. (Cf. *Smith v. Stewart* (2008) 291 Ga.App. 86, 89–92 [660 S.E.2d 822, 828–829] [fictional character shared 26 similar biographical details with plaintiff such as going to the same high school, having daughters, having their first husbands die from a car accident, becoming engaged to men who owned nursing homes in Florida and were engaged to other women, and being awarded $750,000 in divorces from their second husbands].) Finally, there are no other identifying characteristics that would apply to plaintiff, such as a description of a unique manner of performing his work. (Cf. *Bindrim, supra,* 92 Cal.App.3d at p. 69 [Plaintiff was a psychologist who used "nude marathon" in group therapy.].) On this record, we conclude that no reasonable person would have understood the casting synopsis for the fictional Scott Tamkin as referring to the real Scott Tamkin. (Cf. *Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 320, 326 [79 Cal.Rptr.2d 207] [Although the author was a schoolmate of plaintiff Michael Polydoros and although the fictional Michael Palledorous and plaintiff had similar names and attire, grew up in a similar childhood setting, enjoyed playing baseball in a sandlot, swimming in the community pool, and had brash natures, the plaintiff was not entitled to any relief on his defamation claim because the fictional work did not portray him at all.].)

Similarly, no reasonable person would have understood that the casting synopsis for the fictional Melinda Tamkin referred to the real Melinda Tamkin. The synopsis reveals that the fictional Melinda is in her mid-30's, Scott's wife, attractive, athletic, and a real estate agent. These descriptive terms, however, do not sufficiently demonstrate that the fictional Melinda Tamkin is in fact the real Melinda Tamkin, because none of the physical characteristics are particularly unique and the remaining descriptive characteristics are insufficient by themselves to show that the fictional character is in fact plaintiff.

The same analysis applies to the actual depiction of the characters on episode 913. The characters portrayed on the show do not differ significantly from the casting synopses. The major differences are the characters' last name is now Tucker, they live in Las Vegas, Scott is shown to use high-fluoride toothpaste, and Melinda is shown to drink red wine and to use running shoes. None of these descriptive characteristics would assist a reasonable person in recognizing that the fictional Tuckers were in fact the real Tamkins. On this record, we conclude that no reasonable person would have understood the characters portrayed in episode 913 to be plaintiffs. (Cf. *Aguilar v. Universal City Studios, Inc., supra,* 174 Cal.App.3d at pp. 387–388 [Although the plaintiff and the fictional character shared the same first name and participated in the event depicted in the fictional work and although another person recognized the fictional character as the plaintiff, "no reasonable person could understand the character 'Bertha' in the motion picture . . . to be a portrayal of [plaintiff]."].)

We also conclude that no reasonable person who read the casting synopses and then saw the television broadcast would have understood the fictional characters portrayed in episode 913 to be plaintiffs. The casting synopses would have revealed that the characters were initially named Scott and Melinda Tamkin, but as we previously concluded, no reasonable person would have understood from the casting synopses that the fictional Tamkins were in fact the real-life Tamkins. If a person were suspicious that the fictional Tamkins were in fact plaintiffs, episode 913 would not have confirmed that suspicion, because the additional descriptive depictions (Scott's use of high-fluoride toothpaste and Melinda's wine drinking and running) are not sufficiently unique and the episode included other differences, such as a different locale and the absence of children.

Our conclusion is further supported by plaintiffs' own evidence. In his declaration in support of the opposition to the anti-SLAPP motion, Scott

Tamkin submitted some search results purporting to show that the defamatory statements in the casting synopses and/or episode 913 referred to him and his wife. The searches all occurred after the casting synopses were posted on spoiler Web sites and after episode 913 was broadcasted. The search result for "scott tamkin" does not show a linked Web site with a defamatory statement until page five of the results (results 51 to 60). The fourth linked Web site on that page has Scott Tamkin's name and the terms "slick, attractive, hard-drinking." The linked Web site also references "csi las vegas," and directly underneath the reference, it says "Episode (9x13) Spoilers." However, there is no reference to "bondage" or "porn." Only if a reader followed the link and viewed the actual Web site would the reader see the entire casting synopses, referenced previously, which were specifically identified as spoilers from a *CSI* episode. Thus, a reasonable person searching for the real Scott Tamkin would not have made the association between Scott Tamkin and the defamatory statements.

Plaintiffs also submitted additional results for Internet searches of "scott tamkin bondage," "scott tamkin CSI," and "melinda tamkin bondage." These searches do show a stronger association between the Tamkins and the defamatory statements. However, these searches are not representative of a reasonable person looking for a real estate agent or searching for the Tamkins. Moreover, the one linked pornographic Web site page submitted by plaintiffs contains none of defendants' allegedly defamatory statements.

We thus conclude that plaintiffs have not met their burden of showing a probability that they would prevail on their defamation causes of action because they cannot show that a reasonable person would have understood that the defamatory statements referred to them.

Plaintiffs' false light invasion of privacy cause of action fails for the same reasons. (See *Kapellas v. Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912] [False light claim "is in substance equivalent to the [plaintiff's] libel claim, and should meet the same requirements of the libel claim on all aspects."]; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 34 [53 Cal.Rptr.3d 752] [The collapse of the defamation claim spells the demise of all other causes of action in the same complaint which allegedly arise from the same publication.].)

In short, we conclude that all of the causes of action in plaintiffs' complaint were subject to being stricken under the anti-SLAPP statute. Accordingly, the anti-SLAPP motion should have been granted.

## DISPOSITION

The order of the trial court denying defendants' special motion to strike pursuant to section 425.16 is reversed. The matter is remanded, and the trial court is directed to enter a new order granting the motion. Costs are awarded to appellants.

Epstein, P. J., and Willhite, J., concurred.