Filed 12/31/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BASSEL OJJEH,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN BROWN et al.,<br><br>    Defendants and Appellants. | A154889<br><br>(San Mateo County<br>Super. Ct. No. 18CIV01902) |

Defendants Stephen Brown (Brown) and Ignite Channel, Inc. (Ignite) solicited and obtained $180,000 in investments from plaintiff Bassel Ojjeh to produce a documentary film on the refugee crisis in Syria. Plaintiff later sued, claiming that no "significant" or "substantial" work had been performed on the film, and that defendants had breached their contractual obligations, defrauded him of his investments, and used his investments for purposes unrelated to the film. Defendants filed a special motion to strike the complaint or portions thereof under the anti-SLAPP law (Code Civ. Proc., § 425.16),[1] claiming the complaint targeted their protected speech activity in producing the documentary. The trial court denied the motion at the first stage of the anti-SLAPP analysis, finding the complaint does not arise from acts in furtherance of defendants' exercise of their right of free speech.

We conclude defendants have made a prima facie showing that the complaint targets conduct falling within the so-called "catchall" provision of the anti-SLAPP law. (§ 425.16, subd. (e)(4).) Specifically, defendants' solicitation of investments from plaintiff and their performance of allegedly unsatisfactory work on the uncompleted

---

[1]     All further statutory references are to this code unless otherwise stated.

1

documentary constituted activity in furtherance of their right of free speech in connection with an issue of public interest.  Accordingly, the trial court erred in denying defendants' motion at the first stage of the anti-SLAPP analysis.  We reverse and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2018, plaintiff filed a complaint against defendants for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) fraud, (4) false promise, (5) violation of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.), (6) conversion, and (7) unjust enrichment.  The complaint alleges as follows:

In early 2016, plaintiff and defendant Brown spoke about the situation in Syria and the human suffering occurring there.  Afterwards, Brown solicited an investment from plaintiff to make a documentary motion picture about the Syrian refugee crisis.  Brown represented that the investment would be used by his company, defendant Ignite, "to fund the filming and production of the Documentary, for which Brown had high goals, including eventual submission to the Oscars in 2016."  In June 2016, plaintiff and Ignite signed an investor agreement, and plaintiff made an investment of $150,000.  Production was scheduled to take place in 2016, and the film's release was scheduled for 2017.

In April 2017, Brown told plaintiff the film was in the production phase and requested additional funding.  In reliance on this representation, plaintiff made an additional $30,000 investment.  Brown later represented in December 2017 that production was almost finished.  Whenever plaintiff requested to see progress of the film, however, defendants were evasive, claimed to have lost an initial set of footage, and showed him only short clips that were raw and not ready for an audience.

Plaintiff alleges that no "significant" work on the documentary has occurred, and that defendants never had any intention of making the documentary.  Instead, Brown has used the invested funds for his own purposes, including the promotion of his image and work on projects unrelated to the documentary or to Ignite.  Plaintiff further alleges that a cinematographer hired by defendants to work on the documentary has not been paid for

2

his work, and that the cinematographer believes he owns the right to any footage he has shot, putting the entire project in jeopardy.

### The Causes of Action

Plaintiff's first cause of action for breach of contract alleges in relevant part that defendants were required under the investor agreement to film and produce the documentary, that a timeline was set for production to occur in 2016 and for release of the film in 2016 or 2017 at the latest, but that defendants failed to perform their contractual obligations, as "no significant work" has taken place on the documentary.

In the second cause of action for breach of the covenant of good faith and fair dealing, plaintiff alleges in relevant part that defendants "were required to film and produce the Documentary" but that they "did not act in good faith" and "did not perform under the contract and never had any intention to do so. Instead, they used Plaintiff's investment for Brown's own purposes, including his unrelated self-promotion and work on unrelated projects," and this unfairly interfered with plaintiff's right to receive the benefit of having the documentary made.

In the third cause of action for fraud, plaintiff alleges in relevant part that defendants falsely told him they would use his investment for filming and producing the documentary, with production to finish in 2016 and release to occur in 2017, but at the time they made these representations, they had no intention of using plaintiff's investment for such purposes, as evidenced by the fact that no significant work has been done on the film. Plaintiff further alleges that defendants solicited additional funds from him by falsely representing that the documentary was in the production phase, when in fact no significant work had been completed. Defendants allegedly never intended to use plaintiff's investments for completing the production phase, as evidenced by Brown's use of the money on self-promotion and projects unrelated to the documentary.

In the fourth cause of action for false promise, plaintiff alleges in relevant part that defendants promised to use his investment to film and produce the documentary, but they had no such intention; rather, they intended that plaintiff would rely on their promise so that they could use his money for promoting Brown's personal image and working on

3

projects unrelated to Ignite. Plaintiff alleges defendants have not performed any significant work toward the documentary.

In the fifth cause of action for violation of the UCL, plaintiff alleges in relevant part that defendants violated the UCL by misrepresenting their intention to use plaintiff's investment to film and produce the documentary while not performing any significant work on the film. Plaintiff alleges that defendants used his investment funds for promoting Brown's personal image and on products unrelated to Ignite and the documentary.

In the sixth cause of action for conversion, plaintiff alleges in relevant part that he invested money into the documentary with the understanding that it would be used for filming and production, but that defendants never intended to film and produce the documentary. Plaintiff alleges that because no substantial work has been completed, defendants have no lawful claim to plaintiff's money and have intentionally and substantially interfered with his property by refusing to return his investment after he demanded it.

Finally, in the seventh cause of action for unjust enrichment, plaintiff alleges in relevant part that defendants received a total of $180,000 from him as investment in the documentary, but that they have failed to perform any significant work on the documentary and have wrongfully and fraudulently kept the money for Brown's own personal uses.

### *The Anti-SLAPP Motion*

Defendants filed an anti-SLAPP motion to strike plaintiff's complaint in its entirety, or alternatively, any offending causes of action or allegations therein. Defendants argued the complaint arises out of acts in furtherance of their right of free speech in connection with an issue of public interest, namely, their newsgathering activities for the documentary on the Syrian refugee crisis. Defendants further argued that plaintiff could not demonstrate minimal merit on his claims because (1) the entire action is subject to an arbitration provision; (2) plaintiff's allegations are contradicted by

4

the investor agreement and the evidence; and (3) the evidence establishes that substantial progress was made towards initiating and completing the film.

The trial court denied the motion at the first stage of the anti-SLAPP analysis, concluding plaintiff's causes of action did not arise out of acts in furtherance of defendants' protected speech, but rather, "are based on the failure to do acts in furtherance of the right of free speech. Breaching the agreement by failing to make the film does not 'help to advance [the rights of free speech] or assist in the exercise of that right.' "

Defendants appealed.

## DISCUSSION

The anti-SLAPP statute authorizes a special motion to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) This law "allows defendants to request early judicial screening of legal claims targeting free speech or petitioning activities" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880–881 (*Wilson*)), and its provisions must be construed broadly (§ 425.16, subd. (a)). We review de novo the decision to deny an anti-SLAPP motion. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326.)

Resolution of an anti-SLAPP motion involves two steps. First, the moving defendant must show that the challenged claim or claims arise from the defendant's constitutionally protected free speech or petition rights. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381–382, 396 (*Baral*).) A defendant need only make a prima facie showing at this stage. (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 112.) In determining whether the defendant has met this burden, we disregard the labels attached to the causes of action (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 824) and consider their elements and what actions by the defendant supply those elements and consequently form the basis for liability (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063 (*Park*)). Allegations of protected activity that are

5

" 'merely incidental' or 'collateral' " or that "merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral*, at p. 394.) If the defendant makes the requisite showing at the first stage, the burden then shifts to the plaintiff to demonstrate the claim's merit by establishing a probability of success. (*Id.* at p. 396.)

Section 425.16, subdivision (e), describes four categories of conduct that constitute an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Relevant here is the catchall provision, which defines protected activity to include "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) This category extends the protection of the anti-SLAPP statute beyond actual instances of free speech to all conduct in furtherance of the exercise of that right when undertaken in connection with a public issue or issue of public interest. (*Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 (*Lieberman*).)

There is no question that the Syrian refugee crisis is an issue of public interest. (See *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*) [issue of public interest is broadly defined as " 'any issue in which the public is interested' "]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1546–1547 [discussing common attributes of issues of public interest].) Moreover, it is settled that reporting the news is protected speech activity (*Lieberman*, *supra*, 110 Cal.App.4th at p. 166), and we have no trouble concluding the proposed documentary is akin to news reporting for purposes of the anti-SLAPP law.[2] The instant action, however, does not arise from a completed documentary on the Syrian refugee crisis, but from conduct preliminary to a

---

[2]     Additionally, movies and films are generally considered " 'expressive works' " subject to First Amendment protections. (*Daniel v. Wayans* (2017) 8 Cal.App.5th 367, 383.)

6

film that was not complete at the time the lawsuit was filed.  To determine whether the catchall provision applies under these circumstances, we must clearly identify which activities form the basis for plaintiff's claims (*Park*, *supra*, 2 Cal.5th at pp. 1062–1063) and then ascertain whether those activities were "in furtherance" of defendants' exercise of free speech "in connection with" the asserted issue of public interest.  (§ 425.16, subd. (e)(4).)  We address these issues below.

### A.  The Actions by Defendants Which Supply the Elements of Plaintiff's Claims

We begin with an overview of the requisite elements of plaintiff's claims.  To prove breach of contract, plaintiff must show that the parties had, and defendants breached, an enforceable agreement to film and produce the documentary.  (*Kumaraperu v. Feldsted* (2015) 237 Cal.App.4th 60, 69.)  To prove breach of the implied covenant of good faith and fair dealing, plaintiff must show that defendants engaged in conduct which frustrated plaintiff's rights to the benefits of the parties' agreement that defendants would film and produce the documentary.  (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1244.)  Plaintiff's fraud and false promise claims require proof that defendants promised to use plaintiff's investment funds to produce the film without the intent to do so, and that plaintiff reasonably relied upon this promise to his injury.  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)  To prove his UCL claim, plaintiff must show that defendants engaged in a fraudulent business act or practice that was likely to deceive members of the public.  (*Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 258.)  To prove conversion, plaintiff must show that defendants wrongfully exercised dominion over his property.  (*Duke v. Superior Court* (2017) 18 Cal.App.5th 490, 501.)  Finally, plaintiff's unjust enrichment claim requires proof that defendants received and unjustly retained a benefit at plaintiff's expense.  (*Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1593.)

With these elements in mind, we turn to the question of whether the complaint supplies one or more of these elements with allegations of protected activity by defendants.  In this regard, the parties dispute what the liability-producing conduct is.

7

Defendants argue the complaint targets their efforts, through *affirmative* speech and conduct, to produce the documentary and raise public awareness of the Syrian refugee crisis.[3] Conversely, plaintiff contends that the complaint targets defendants' *failure* to act to produce the documentary. The trial court likewise viewed the complaint as arising out of defendants' breach of the investor agreement and their "not making of the documentary."

Our de novo review leads us to conclude that defendants have the more persuasive argument. The complaint does not allege that defendants performed *no* work on the documentary, thus a failure to act is not at issue. Rather, the complaint alleges that defendants failed to perform "significant" or "substantial" work on the documentary, implying that some work was undertaken. Indeed, the complaint acknowledges that a cinematographer hired by defendants shot footage for the documentary, and that defendants showed plaintiff short clips of the proposed film. Defendants are therefore correct that the allegations concern affirmative conduct regarding the quality and quantity of the performance they rendered in connection with the production of the documentary. This alleged failure to perform significant work on the film supplies the requisite element of breach in the contract-based causes of action, and the wrongfulness of defendants' retention of the invested funds for purposes of plaintiff's conversion and unjust enrichment causes of action.

Additionally, there appear two other categories of affirmative conduct in the complaint. First, the complaint targets statements made by defendants while soliciting investment funds from plaintiff. This conduct supplies the requisite element of

---

[3]     On appeal, defendants request judicial notice under Evidence Code section 452, subdivision (h), of the fact that the documentary at issue in this case won an award at a film festival in November 2019. We deny the request. Defendants did not properly make the request by motion (Cal. Rules of Court, rule 8.252(a)), and the matter for which judicial notice is sought was not before the trial court at the time of its ruling (*MMM Holdings, Inc. v. Reich* (2018) 21 Cal.App.5th 167, 187). It has long been the general rule that an appellate court reviews the correctness of the decision at the time of its rendition, and defendants have shown no exceptional circumstances for this court to make findings of fact on appeal. (*Ibid.*)

misrepresentation/false promise in the third, fourth, and fifth causes of action, all of which sound in fraud. The complaint also targets defendants' alleged use of the solicited funds for purposes unrelated to the documentary. This alleged conduct appears in the second through fifth and seventh causes of action.

All of these categories of affirmative conduct appear critical to plaintiff's theories of liability and are not reasonably viewed as merely incidental, collateral, or contextual to plaintiff's claims for relief. (*Baral*, *supra*, 1 Cal.5th at p. 394.) And though the complaint also alleges that defendants had no intention of actually making the documentary, our task at the first stage of the anti-SLAPP analysis is to examine the challenged conduct without regard to the allegations of improper motive. (*Wilson*, *supra*, 7 Cal.5th at p. 888.)

In addition to the complaint's allegations, the parties' evidentiary submissions reinforce our conclusion that the lawsuit targets defendants' affirmative conduct. (See § 425.16, subd. (b)(2) [court shall consider evidentiary submissions on anti-SLAPP motion]; *Wilson*, *supra*, 7 Cal.5th at p. 887 [courts must look beyond pleadings to consider any party evidentiary submissions at first step]; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1286 [looking to declaration in first prong analysis where conduct was "only vaguely described in the cross-complaint"].) In support of the anti-SLAPP motion, Brown submitted a declaration in which he stated that through December 2017, defendants gathered over 10 Terabytes of video files representing over 100 hours of video, that numerous individuals including refugees, activists, and government officials were interviewed, that Ignite maintained an online journal of refugees' stories to gather ideas that could be used for the production, and that Ignite also produced a "sizzle" reel related to the main stories. Although plaintiff submitted a declaration claiming he was never shown the sizzle reel and criticizing the footage he had seen as "rough and poorly edited," plaintiff did not dispute that the other work outlined in Brown's declaration was performed.

Plaintiff also implicitly conceded that defendants made some measure of progress on the documentary by stating in his declaration that Brown had not shown significant

9

progress "since March 2017." Additionally, plaintiff submitted the declaration of Jonathan Kloberdanz, the cinematographer referred to in the complaint, who represented that he began work on the documentary full-time in February 2016, and that he traveled to Europe in March 2016 at Brown's request and sent Brown some of his footage. Although Kloberdanz believed that the project was severely understaffed and that Brown was not looking at the footage he submitted, his statements nonetheless present a prima facie case that defendants performed some amount of work in connection with the documentary in 2016.[4]

Thus, based on the complaint's allegations and the parties' evidentiary submissions, we conclude that defendants' affirmative conduct (i.e., soliciting investments, performing partial work on the uncompleted film, and using the invested funds for purposes unrelated to the film) supplied elements of each of plaintiff's causes of action. We next determine whether that conduct was "in furtherance" of defendants' exercise of free speech. (§ 425.16, subd. (e)(4).)

**B. Conduct in Furtherance of the Exercise of Free Speech**

"An act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right." (*Tamkin*, *supra*, 193 Cal.App.4th at p. 143; *Lieberman*, *supra*, 110 Cal.App.4th at p. 166 [furtherance means helping to advance, assisting].) It goes without saying that in order to produce a documentary, a filmmaker must obtain footage and collect information on the subject matter. Thus, defendants' hiring and use of a cinematographer to obtain on-location footage and their maintaining an online journal of refugees' stories to gather ideas for the production are reasonably viewed as conduct "in furtherance" of the documentary, however unsatisfactory or dilatory plaintiff viewed their performance.

---

[4] We emphasize that our consideration of plaintiff's evidentiary submissions at this first stage is solely to identify and discuss the actions of defendants which supply the elements of plaintiff's causes of action. We express no opinion regarding the effect of such submissions on any merits determination regarding plaintiff's claims.

Defendants' solicitation of investment funding is also reasonably viewed as conduct in furtherance of the documentary's production. As the complaint alleged, defendants sought investor funding from plaintiff for the stated purpose of financing the filming and production of the documentary, and there appears no dispute that application of such funding toward the documentary would have furthered or helped advance the project within the meaning of the catchall provision. (See *Tamkin*, *supra*, 193 Cal.App.4th at p. 143; *Lieberman*, *supra*, 110 Cal.App.4th at p. 166.) And again, it is of no consequence at this stage of the analysis that the solicitation was allegedly made with a fraudulent motive. (*Wilson*, *supra*, 7 Cal.5th at p. 888.)[5]

Because the film had not been completed at the time the complaint was filed, plaintiff contends there was no "actual speech" that qualified for protection. In support, he cites *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873 (*Digerati Holdings*). Defendants respond that the anti-SLAPP law has no " 'proof of completion' " requirement and that the law protects preliminary preproduction conduct in the news reporting process.

*Digerati Holdings* involved an entertainment production company's breach of contract claim alleging the complete failure of an entertainer (and his company) to perform obligations under an agreement to make a biographical documentary film about the entertainer. (*Digerati Holdings*, *supra*, 194 Cal.App.4th at pp. 885–886.) The appellate court held that the entertainer's failure to perform was not conduct in furtherance of his right of petition or free speech. (*Ibid.*)

*Digerati Holdings* is distinguishable from the instant case, where plaintiff's causes of action, including his breach of contract cause of action, allege various forms of affirmative conduct beyond a complete failure to perform. The issue presented here is

---

[5]    As for defendants' alleged use of the funds for purposes unrelated to the film, we conclude this does not implicate protected activity, as such conduct would tend to hinder, not advance, production of the film. However, none of the causes of action in the complaint was based exclusively on this allegation of unprotected activity. Thus, at this first stage of the anti-SLAPP analysis, we simply disregard the allegations of unprotected activity. (*Baral*, *supra*, 1 Cal.5th at p. 396.)

11

whether those affirmative acts in connection with an ultimately incomplete film can still be said to have furthered the exercise of defendants' free speech rights. Once again, we are more persuaded by defendants' position.

To the extent an exercise of the right of free speech is viewed as contemplating "completion" of the free speech activity (i.e., a completed news broadcast or film), we may reasonably assume that, in many cases, the completed free speech activity was preceded by preliminary steps taken in "helping to advance" (*Lieberman*, *supra*, 110 Cal.App.4th at p. 166) the speech. For instance, newsgathering activities are often preliminary to the protected activity of reporting the news (*id.* at pp. 161–162, 164); casting decisions for weather anchors or actors are preliminary to the protected activity of reporting the weather or producing a television show (*Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1522 (*Hunter*); *Tamkin*, *supra*, 193 Cal.App.4th at p. 143); and a musician's selection of supporting band members is preliminary to the protected activity of performing or recording music (*Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1106).

Case law recognizes that protection may be afforded to preliminary actions that assist or are helpful in advancing the exercise of the right of free speech, even if the speech activity is still formative or incomplete at the time a lawsuit is filed. An illustrative case is *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76 (*San Diegans*), which involved a lawsuit challenging two contracts—a collaborative work agreement and a lease for office space—between an independent nonprofit news company (inewsource) and a public radio station (KPBS) affiliated with San Diego State University. Under those contracts, inewsource would receive office space and newsgathering equipment and facilities, and KPBS would receive all of inewsource's content (including a set number of specific types of stories) for distribution on radio, television, and the Internet. (*San Diegans*, at p. 85.) After inewsource published articles critical of a local attorney, the plaintiff (which allegedly was controlled by the attorney) sued inewsource, San Diego State University, and others, alleging that the contracts between inewsource and KPBS were "void" and in

12

violation of statutory prohibitions on self-dealing involving public funds because inewsource's founder was also a faculty member of the university and influenced both sides of the transaction. (*Id.* at p. 89.)

In affirming the trial court's order granting the defendants' anti-SLAPP motion, the *San Diegans* court concluded that the plaintiff's lawsuit arose from protected activity because the contracts at issue directly affected the content of news stories the public receives. (*San Diegans*, *supra*, 13 Cal.App.5th at p. 106.) That is, the injury-producing conduct underlying the plaintiff's claims, i.e., the contracts, "shape[d] the way inewsource and KPBS gather, produce, and report the news." (*Ibid.*) As in our case, the lawsuit in *San Diegans* did not arise from any completed news broadcast, but from the contracts providing the means for generating and publishing news content going forward.

Plaintiff contends, however, that *San Diegans* involved completed speech activity because the lawsuit followed inewsource's publication of the articles critical of the local attorney. But the lawsuit there did not *arise from* those articles simply because the articles preceded the suit or may have "triggered" it. (See *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) As explained, the lawsuit sought to void the contracts between KPBS and inewsource, which would have the effect of impairing their ability to report the news.

These cases support our conclusion that, depending on the circumstances, the "in furtherance" requirement of section 425.16, subdivision (e)(4), may be satisfied by conduct preliminary to a completed exercise of the right of free speech. It is not unreasonable to conceive that conduct can assist and help to advance the exercise of the right of free speech, even if that assistance did not result in a completed exercise of free speech at the time a lawsuit is filed. A clear example would be a lawsuit seeking to enjoin an as-of-yet unaired news broadcast based on allegations of unlawful newsgathering activities. Plaintiff provides no reason why newsgathering activity and other actions contributing to a broadcast report should be less deserving of anti-SLAPP protection than the broadcast report itself. Indeed, a lawsuit targeting newsgathering

activity threatens to chill participation in speech-related processes and, if successful, may block the exercise of free speech.

In light of the foregoing, we conclude defendants' alleged conduct of soliciting investment funds and performing partial work on the documentary was, for anti-SLAPP purposes, in furtherance of producing the documentary in the exercise of the right of free speech.

### C. Conduct in Connection with a Public Issue or Issue of Public Interest

Next, we address whether defendants' conduct in furtherance of the exercise of free speech was "in connection with" a public issue or issue of public interest. (§ 425.16, subd. (e)(4).) To make this determination, we look to the content of the speech and assess the functional relationship between the speech and the public conversation about the matter of public interest. (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149–150 (*FilmOn*).) "[T]he catchall provision demands 'some degree of closeness' between the challenged statements and the asserted public interest. . . . '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Id.* at p. 150.) "[W]e examine whether a defendant—through public or private speech or conduct— participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.) In conducting this examination, we consider "context—including audience, speaker, and purpose." (*Id.* at p. 152.)

The Supreme Court's decision in *FilmOn* is instructive. There, the plaintiff was a distributor of entertainment content on the Web, and the defendant was a business providing Internet advertisers with online tracking verification and brand safety services. The plaintiff alleged that the defendant had made false and disparaging reports to the defendant's clients that the plaintiff's digital distribution network contained adult and copyright-infringing content, which allegedly caused the defendant's clients to refuse to advertise on the plaintiff's network. (*FilmOn*, *supra*, 7 Cal.5th at pp. 141–142.) While acknowledging that the prevalence of adult and copyright-infringing content on the Internet was an issue of public interest, the Supreme Court observed that the defendant's

reports were generated for profit and exchanged confidentially. Because the reports were not part of "any attempt to participate in a larger public discussion," the court determined they did not qualify for protection under the catchall provision. (*Id.* at p. 140.)

As plaintiff repeatedly points out, the proposed documentary in this case was not completed at the time he filed his complaint. Thus, like the confidential reports in *FilmOn*, the documentary "never entered the public sphere." (*FilmOn*, *supra*, 7 Cal.5th at p. 153.) Critically, however, the two cases differ significantly in their respective contexts. (*Id.* at p. 148 [emphasizing that "context matters under the catchall provision"].)

In *FilmOn*, the allegedly disparaging reports were shared confidentially with only the defendant's advertising clients, and the parties never intended the reports to enter the public sphere. (*FilmOn*, *supra*, 7 Cal.5th at p. 153.) In sharp contrast, the conduct at issue here involves the parties' discussions to make a feature documentary film for a public audience. Again, we may look to the parties' evidentiary submissions as part of our first prong analysis. (*Wilson*, *supra*, 7 Cal.5th at p. 887; *Salma v. Capon*, *supra*, 161 Cal.App.4th at p. 1286.) As Brown described in his declaration, plaintiff approached him with the concept of a documentary feature film "that would raise public awareness about the Syrian refugee crisis." Brown was interested in the project because of "the subject's newsworthiness, the scale of the issue as the largest humanitarian crisis in a generation, the ongoing war in Syria with no end in sight, and the impact on the United States presidential race and on other political discussions and debates around the world." The parties had Academy Award aspirations and specifically discussed how the film might best generate empathy and raise public awareness of the plight of Syrian refugees. And during production, defendants maintained an online journal referencing the documentary and inviting interested persons to share their stories, photographs, and videos. Thus, despite being incomplete when the complaint was filed, the proposed documentary was speech activity intended for "the public sphere" (*FilmOn*, at p. 153), and defendants' work thereon constituted an "attempt to participate in a larger public discussion" (*id.* at p. 140). Content-wise, defendants' efforts in obtaining the interview

footage of individuals affected by and involved in the refugee crisis and in maintaining an online journal of refugees' stories were directly related to the asserted issue of public interest and were undertaken to contribute toward the public discourse on the matter. Likewise, defendants' efforts to secure funding for the documentary's production was functionally related to the advancement of its message, as Brown's declaration explained that funding was necessary for production, post-production, promotion, and distribution of the film. This "union of content and context" (*id.* at p. 154) leads us to conclude there is a sufficient "degree of closeness" between the challenged conduct and the promotion of the film's message to merit application of the catchall provision. (*Id.* at pp. 149–150.)

Plaintiff makes the broader argument that the anti-SLAPP law was never intended to apply in a lawsuit that is not attempting to silence the defendants' exercise of speech, but rather alleges the defendants *should have engaged* in the speech activity as promised. While this may or may not be a valid distinction in cases involving a defendant's complete failure to perform, the purpose of the anti-SLAPP law—to encourage public participation in matters of public significance by authorizing early judicial screening of lawsuits that would chill the exercise of free speech and petition (§ 425.16, subd. (a))—is still advanced where, as here, a complaint targets the quality or sufficiency of the defendants' actions in preparing to exercise their right to free speech on a matter of public significance.

For all of these reasons, we conclude defendants made a prima facie showing sufficient to establish that the complaint arises from protected activity. (§ 425.16, subds. (b), (e).) Accordingly, the trial court's order denying the anti-SLAPP motion at the first stage of the analysis must be reversed, and plaintiff's causes of action must be screened for merit. (See fn. 4, *ante*.)

## CONCLUSION AND DISPOSITION

Because the trial court denied defendants' motion at the first stage of the anti-SLAPP analysis, it did not address whether plaintiff met his burden under the second step to show a probability of prevailing. Although plaintiff requests that we perform that analysis on appeal, we will, instead, take "the more prudent course" by remanding the

16

matter to the trial court to make that determination in the first instance. (*Hunter*, *supra*, 221 Cal.App.4th at p. 1527.)

The order denying the anti-SLAPP motion is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion. Defendants are entitled to their costs on appeal.

_____
Fujisaki, J.


We concur:


_____
Siggins, P.J.


_____
Goode, J.[*]


A154889


_____
[*]    Retired Judge of the Superior Court of Contra Costa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

<u>Bassel Ojjeh v. Stephen Brown et al.</u>

(A154889)

Trial court:          San Mateo County

Trial Judges:          Hon. Susan Greenberg

Attorneys:          Walter C. Cook for Defendants and Appellants.

                   Structure Law Group, Mark R. Figueiredo, Ethan G. Solove, Austin
                   T. Jackson for Plaintiff and Respondent.