Filed 10/4/16  Sobini  Films v. Clear Skies Nevada CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SOBINI FILMS, INC., et al., | B267431 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC582989) |
| v. | |
| CLEAR SKIES NEVADA, LLC et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court for the County of Los Angeles. Susan Bryant-Deason, Judge.  Reversed.

Eisner Jaffe, Harvey I. Saferstein, Sarah F. Powers and Brianna Dahlberg for Defendants and Appellants.

Law Office of Alan Rader and Alan Rader for Plaintiffs and Respondents.

.

_____

## SUMMARY

This case presents the question whether breach of contract and related claims based on a mistake in the presentation of producer credits in the title sequence of a motion picture, Good Kill (Voltage Pictures 2014), arose from conduct in furtherance of the exercise of free speech in connection with an issue of public interest within the meaning of the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16, subd. (e)(4).)[1] We hold they did, and we also conclude plaintiffs failed to show a probability of prevailing on their claims. We reverse the trial court's order denying defendants' special motion to strike the complaint.

## FACTS

We begin with a chronology of the facts underlying the dispute, and then summarize additional evidence presented in the parties' moving and opposition papers.

### I. The Parties, the Movie and the Dispute

Plaintiff Sobini Films, Inc., is a motion picture production and financing company, and plaintiff Mark Amin is its founder and chief executive officer. Mr. Amin has extensive experience in the movie industry, and has been involved in the production of over 80 films since the late 1980's, including Oscar and Emmy contenders and winners.

Defendant Clear Skies Nevada, LLC is the owner of the motion picture Good Kill (the film), holding the exclusive right to produce and exploit the film. Defendant Voltage Pictures, LLC is the film's exclusive sales agent. The film follows the life of an Air Force drone pilot who becomes disillusioned with drone flying and begins to question the ethics of the missions to which he is assigned. According to Mr. Amin, the Good Kill project was "an opportunity for me to be part of an important and artistic film."

On January 29, 2014, Clear Skies and Sobini Films executed an agreement, captioned the "term sheet," with respect to the then-proposed film. Voltage Pictures agreed to be bound by the express obligations in the term sheet and to guarantee unconditionally all of Clear Skies' obligations to Sobini Films under the term sheet.

---

[1] Further statutory references are to the Code of Civil Procedure.

Clear Skies and Sobini Films each agreed to a financial contribution of $1.3 million.  Among many other provisions, the term sheet included this obligation in paragraph 5, governing credits:  "(b)  Amin Credit.  Mark Amin shall be entitled to:  one (1) individual producer credit on screen, in no less than third position of all 'Produced by' credits, on a single card, which credit shall appear in the main titles of the Picture . . . ."  (Sobini Films was also entitled to a production company credit, and was entitled to designate one individual to be accorded executive producer credit and one individual to be accorded associate producer credit (both of these "on a shared card").)  Mr. Amin viewed the film as "a high-visibility project, with potential for award recognition," and for that reason agreed "to reduce my back end compensation from the standard 50% based on my investment, to 30%" in order to obtain the single-card credit (and the "company prestige and stature and therefore future business opportunities" that he expected the single-card credit would bring).

The credit provision of the agreement also stated:  "No casual or inadvertent failure of Clear Skies to comply with the credit requirements, nor any failure of any third party to comply therewith, shall constitute a breach of this Agreement.  If Clear Skies or a third party fails to accord Sobini credit pursuant to the terms of this Agreement, Clear Skies agrees to use reasonable good faith efforts to prospectively cure such failure following receipt of written notice from Sobini setting forth in detail such failure, but nothing shall require Clear Skies to cease using or to replace prints, negative, advertisements or other materials then in existence."

In July 2014, Mr. Amin attended a screening of a rough cut version of the film.  The credit sequence did not have his "single card 'Produced By' credit."  Instead, Mr. Amin's name appeared as the third name on a shared card, below the names of two Voltage Pictures executives (Nicolas Chartier and Zev Foreman).  Mr. Amin asked one of his executives (Tyler Boehm, vice president of Sobini Films) to bring the error to the attention of his counterpart at Voltage Pictures and to insist on a correction.  Mr. Boehm spoke with Mr. Foreman, president of production at Voltage Pictures, about the incorrect credit.  (Mr. Foreman had primary responsibility for all aspects of the

3

production of the film.)  According to Mr. Boehm, "Zev told me that the credit sequence was a temporary placeholder put together by the director and editor and not to worry about it because it would be fixed."  Mr. Boehm emailed Mr. Amin on July 16, 2014, stating:  "You are getting a single card.  Per Zev, the whole credit sequence is a temp thing that Andrew [(the director)] and the editor threw together."

On September 5, 2014, the film's first public showing occurred at the Venice film festival.  According to Mr. Foreman, both he and Mr. Amin attended and "I saw that Amin viewed the Film, including the main title credit sequence.  No one, including Amin, objected to the content or format of the Film's credits . . . ."

In January 2015, Clear Skies delivered the film to IFC Films for distribution in the United States.  "Since delivery, IFC has released the film theatrically and also to cable companies to provide 'VOD,' or 'video on demand,' " and Clear Skies delivered the film to distributors in other markets for similar purposes.

In April 2015, Cami Winikoff, president of Sobini Films, attended the New York premiere of the film; saw that Mr. Amin's credit "was not the single card, 'Produced by' credit"; and sent an email to Nicolas Chartier and Zev Foreman.  Her April 22, 2015 email stated:  "Hi Nicolas,  [¶]  Per your conversation with Mark, please find attached the contractual provision for Mark's credit on 'Good Kill.'  [¶]  Please confirm that this will be corrected."

According to Ms. Winikoff, she got a phone call from Mr. Foreman in response to her email.  "During that first call, he said he was sorry for the mistake.  But over the next few days I received several more calls from him, each time with a different excuse for why nothing was going to be done to correct the credits."  According to Mr. Foreman, he began to work to resolve the matter "[a]s soon as I received Ms. Winikoff's April 22, 2015 call . . . ."  No copies of the film with the original credit sequence were delivered to any distributors after April 22, 2015.

On May 6, 2015, counsel for plaintiffs sent defendants a letter demanding immediate correction of Mr. Amin's credit in the film.  Late that afternoon, Mr. Amin emailed Mr. Chartier, saying that "[a]ll my demands for the correction of my rightful

4

credit are being ignored," and that he would take legal action if he did not receive written confirmation of the correction before release of the film.

On May 15, 2015, IFC Films released the film in theaters in the United States.

On May 27, 2015, plaintiffs filed their complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory fraud, and a temporary restraining order (TRO) and injunctive relief. Plaintiffs sought no less than $500,000 in damages, punitive damages, a TRO and preliminary injunction restraining further distribution of copies of the film without Mr. Amin's single-card credit, and a permanent injunction compelling defendants to provide a revised version with the appropriate credit to all parties authorized to display or distribute the film.

In early June 2015, the revised version of the title credit sequence was completed, modifying Mr. Amin's credit as requested, and on June 9, 2015, Voltage Pictures provided the new version to IFC Films.

## II.     The Special Motion to Strike the Complaint

In July 2015, defendants filed a special motion to strike the complaint. They asserted that plaintiffs' claims for breach of contract and breach of the implied covenant were premised on defendants' distribution of the film, which was plainly speech, and the film met the "public interest" test in light of the broad construction given that term, citing *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 947 (*Kronemyer*) ("the listing of [producer] credits on respondent's Web site is an act in furtherance of the right of free speech protected under the anti-SLAPP statute").

Relying on the contractual provision that no "casual or inadvertent failure" to comply with the credit requirements would constitute a breach of the agreement, defendants contended plaintiffs could not offer competent and admissible evidence that defendants breached the agreement or that plaintiffs were damaged in any way. They contended the alleged false promise was to perform an existing obligation, and plaintiffs could not show Mr. Foreman made any intentionally false promise.

Plaintiffs' opposition contended the anti-SLAPP statute does not apply because their claims do not involve "a topic of widespread public interest." They contended

5

*Kronemyer* was distinguishable and relied on *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 (*Dyer*) (while movies involve free speech, "not all speech in a movie is of public significance" and the issue "turns on the specific nature of the speech rather than generalities abstracted from it").

In addition to the facts already related, the evidence established a number of points on which there is no dispute or that we necessarily accept as true for purposes of this motion.

Producer credit is a material term in a film production agreement. Single-card producer credit can significantly influence a producer's reputation and financial prospects. Mr. Amin (who viewed the difference between single-card credit and credit on a shared card as "monumental") was entitled to a single card. Defendants made a mistake by distributing the film with Mr. Amin's name on a shared card in January 2015 and the following weeks. It is not uncommon for there to be mistakes made in credits, and when mistakes are made, they are customarily corrected as soon as possible.

Mr. Amin was intimately involved in the production of the film. He was active in both production and post-production. Among many other things, he contributed notes to the screenplay and to several edited cuts; discussed creative and production issues with Andrew Niccol, the screenwriter and director; was present in New Mexico for three of the four weeks of filming there; supervised the day-to-day operation while on set and worked closely with Mr. Niccol on issues related to the cast, wardrobe and production design.

Mr. Amin's declaration stated that he "worked closely with [Mr. Niccol] and the other producers" in post-production. He watched "numerous cuts" and gave his notes to Mr. Niccol and the editor. He attended an editing room screening on June 13, 2014, and another screening at Creative Artists Agency on July 2, 2014. He also gave his notes on three separate cuts he viewed online. (This comports with Mr. Foreman's declaration that Mr. Amin viewed the film, "including the main title credit sequence, on several occasions prior to its official release," and that screeners were made available to Mr. Amin via secure link from July 15 to July 23, 2014; from July 29 to August 5, 2014;

6

and from August 6 to August 13, 2014.) Mr. Amin gave his notes on the three separate cuts he viewed online to Mr. Niccol, the screenwriter and director, and to the film's editor. Apparently, he made no note to the director or editor about the mistake in the credits, even though he noticed the mistake on July 16 and told Mr. Boehm to speak with Mr. Foreman about it. Mr. Boehm's conversation with Mr. Foreman on July 16, 2014, was not confirmed in any writing exchanged with Mr. Foreman, even though Mr. Amin viewed it as a "serious error."

Mr. Amin attended both the Venice and Toronto film festivals in September 2014 to help promote the film. Mr. Foreman saw Mr. Amin in Venice, during the screening of the film, but Mr. Amin did not say anything to Mr. Foreman about the credit mistake. Despite having "worked closely" with them during post-production, he said nothing directly to either Mr. Chartier or Mr. Foreman until a conversation with Mr. Chartier in April 2015 (referred to in Ms. Winikoff's April 22 email).

As previously noted, Ms. Winikoff notified Mr. Foreman of the mistake by telephone and in writing on April 22, 2015, long after the film had been distributed in the United States in January 2015. Mr. Foreman apologized for the mistake and said he would fix it. He did cause the credit mistake to be fixed, but IFC Films did not receive the corrected version until June 9, 2015, several weeks after the film's May 15 theatrical release in the United States with the mistaken credit.

The parties both submitted declarations relating to plaintiffs' claim for damages from the alleged breach. (These declarations and other evidence will be described as necessary in our discussion of the merits, *post*.)

The trial court denied defendants' anti-SLAPP motion. Defendants filed a timely notice of appeal.

## DISCUSSION

### I. The Legal Principles

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public

issue . . . ." (§ 425.16, subd. (b)(1).) As relevant here, an " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' " includes "any . . . conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with . . . an issue of public interest." (*Id.*, subd. (e)(4).)

When ruling on an anti-SLAPP motion, the trial court employs a two-step process. It first looks to see whether the moving party has made a threshold showing that the challenged causes of action arise from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) If the moving party meets this threshold requirement, the burden then shifts to the other party to demonstrate a probability of prevailing on its claims. (*Ibid.*) In making these determinations, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 ["In opposing an anti-SLAPP motion, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial."].)

Our review is de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

## II.     This Case

As we observed at the outset, we conclude defendants made the necessary threshold showing that plaintiffs' complaint arose from protected activity, and plaintiffs failed to produce evidence legally sufficient, if credited, to support a judgment in their favor.

### A.     The first prong:  protected activity

The first dispute in this case is whether the "public interest" element of the anti-SLAPP statute has been satisfied. (§ 425.16, subd. (e)(3)&(4).) Several points are pertinent.

First, "it is beyond dispute that movies involve free speech." (*Dyer, supra,* 147 Cal.App.4th at p. 1280.)

8

Second, it is likewise beyond dispute that the anti-SLAPP statute, including the scope of the term "public interest," is to be construed broadly. (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039-1042 [discussing cases and legislative history of 1997 amendment adding the directive to construe the statute broadly].) *Nygard* concludes: "Taken together, these cases and the legislative history that discusses them suggest that 'an issue of public interest' within the meaning of section 425.16, subdivision (e)(3) is *any issue in which the public is interested.* In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." (*Id.* at p. 1042.)

Third, case precedent holds that "the listing of [producer] credits on [the defendant's] Web site is an act in furtherance of the right of free speech protected under the anti-SLAPP statute." (*Kronemyer, supra,* 150 Cal.App.4th at p. 947; see also *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 144 (*Tamkin* ) [public interest "in the writing, casting and broadcasting" of an episode of a popular television program].)

We see no basis here for departing from the reasoning in *Kronemyer*, which like this case involved producer credits for a film. In *Kronemyer*, the plaintiff claimed he was an executive producer of the motion picture My Big Fat Greek Wedding (IFC Films 2002). The defendant was a Web site that provided a database of information concerning films, television, actors and other industry professionals. The plaintiff sought declaratory relief and asked the court to require the defendant to identify the plaintiff as an executive producer of the film. (*Kronemyer, supra,* 150 Cal.App.4th at p. 944.) The court concluded the gravamen of the lawsuit was "the content of [the defendant's] Web site: the producer credits for the film[] at issue." (*Id.* at p. 947.) "[The defendant's] 'act' was its initial decision not to list [the plaintiff] as a producer and its subsequent decision not to do so after . . . examining his claim." (*Ibid.*)

*Kronemyer* rejected the plaintiff's claim that the public interest requirement was not met. The court first recited the principle that " '[t]he "public interest" component of section 425.16, subdivision (e)(3) and (4) is met when "the statement or activity precipitating the claim involved a topic of widespread public interest," and "the statement

9

. . . in some manner itself contribute[s] to the public debate.' ' " (*Kronemyer, supra,* 150 Cal.App.4th at p. 949.) In *Kronemyer*, the evidence established that 35 million people visited the defendant's Web site each month, and plaintiff described My Big Fat Greek Wedding "as 'a successful independent motion picture.' " (*Ibid.*) The court continued: "On this record, we conclude that the motion picture My Big Fat Greek Wedding was a topic of widespread public interest." (*Ibid.*) The defendant "lists credits as they appear on screen" and one of the reasons for its policies was " 'to avoid getting mired in the frequent disputes among industry professionals and studios regarding who should and should not be included in the credits.' " (*Ibid.*) After observing that the defendant's Web site constituted a public forum, the court concluded the lawsuit was "within the ambit of section 425.16, subdivision (e)(3) and (4)." (*Id.* at p. 950.)

We see no tenable distinction between *Kronemyer* and this case. Here, the gravamen of the complaint is the content of the opening credit sequence of the film – as in *Kronemyer*, "the producer credits for the film[]." (150 Cal.App.4th at p. 947.) Defendants' conduct at issue is the creation of the opening credit sequence and its dissemination to the film's distributors. The film was, by Mr. Amin's own testimony, "a high-visibility project, with potential for award recognition," and "an important and artistic film." (When plaintiffs sought a TRO and injunctive relief, they described the film as a "prominent" movie with "A-list lead actors Ethan Hawke, recently in 'Boyhood,' and January Jones, of 'Mad Men' fame; it addresses a hot-button topic, drone warfare; and it was well reviewed in top-drawer publications such as the New York Times and the New Yorker.") Under these circumstances and the pertinent authorities, it seems clear that plaintiffs' claims arose from "conduct in furtherance of the exercise of" free speech rights "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

We are not persuaded by plaintiffs' arguments to the contrary.

Plaintiffs contend that, because defendants admit their conduct in creating the credit sequence without a single-card credit for Mr. Amin was a mistake, rather than (as plaintiffs contend) intentional conduct, it was not protected First Amendment activity.

10

The two authorities plaintiffs muster to support their assertion that a mistake "cannot logically be described" as conduct in furtherance of free speech do not stand for or suggest that proposition; both involved invalid prior restraints on speech. The free speech rights here concern the production and distribution of a film, in the course of which a mistake was made regarding Mr. Amin's credit. There is nothing illogical in the conclusion that both correct and mistaken speech involve First Amendment activity. It is the act of producing and distributing the film – including its opening credits – that is protected activity, and that necessarily includes mistakes made in the course of doing so.

Plaintiffs also argue, in effect, that the public interest in the film itself does not extend to the opening credits in the film, in which they argue the public has no interest. In support of this argument, plaintiffs rely principally on *Dyer*, *supra,* 147 Cal.App.4th 1273, where the court affirmed the denial of the defendants' anti-SLAPP motion, concluding that "the assertedly false portrayal of [the plaintiff's] persona in the movie" was not protected activity (*id.* at p. 1276) because there was "no discernable public interest" in the alleged misuse of the plaintiff's persona. (*Id.* at p. 1280 ["Although [the film] may address topics of widespread public interest, defendants are unable to draw any connection between those topics and [the plaintiff's] defamation and false light claims."].)[2]

This case is nothing like *Dyer*, having nothing to do with the false and defamatory portrayal of a real person; and it is very much like *Kronemyer*, which found the listing of producer credits to be an act "in furtherance of free speech protected under the anti-SLAPP statute." (*Kronemyer, supra,* 150 Cal.App.4th at p. 947.) Further, as *Tamkin* points out, *Dyer* is distinguishable because the *Dyer* court "did not address whether there

---

[2] *Dyer* involved a film addressing "the issues facing Generation X in the 1990's," in which Ethan Hawke portrays a rebellious slacker named Troy Dyer, who was a classmate of the defendant screenwriter. Mr. Dyer sued for defamation and false light invasion of privacy "based on the allegedly unflattering representation of Troy Dyer in the movie." (*Dyer, supra,* 147 Cal.App.4th at pp. 1276-1277.) The court said that "not all speech in a movie is of public significance" and "the specific dispute" concerned the alleged misuse of Dyer's persona, in which there was "no discernable public interest." (*Id.* at p. 1280.)

was any public interest in the creative process underlying the production of the film."[3] (*Tamkin, supra,* 193 Cal.App.4th at p. 144.)

Here, the listing of producer credits in the opening sequence of the film, while perhaps not itself a part of the "creative process underlying the production" of the film, nonetheless was an essential act in furtherance of producing and distributing the film. Indeed, the credits are a reflection of the creative process, identifying as they do those responsible for production of the film. Credit for the production is surely a matter of public interest throughout the film industry, if not to the viewing public at large. As defendants point out, this very lawsuit immediately generated press coverage in the *Hollywood Reporter.*

In short, defendants' conduct in creating and distributing the credit sequence, an essential part of the film itself, was "conduct in furtherance of the . . . right of free speech in connection with . . . an issue of public interest." (§ 425.16, subd. (e)(4).[4]

---

[3] In *Tamkin*, one of the defendant screenwriters used the plaintiffs' names in a draft script for an episode of *CSI*, and, although their surname was changed in the broadcast of the episode, casting synopses with their names were leaked to Web sites before the broadcast. *Tamkin* held that the writer's use of the plaintiffs' names was an act in furtherance of free speech rights because it "helped to advance or assist in the creation, casting, and broadcasting of an episode of a popular television show." (*Tamkin, supra,* 193 Cal.App.4th at p. 143.) And the defendants' acts were in connection with a matter of public interest: "Here, the creation and broadcasting of *CSI* episode 913 is an issue of public interest because the public was demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode." (*Ibid.*) The court found "a connection between the use of plaintiffs' names and the creative process underlying" the episode, and "no requirement in the anti-SLAPP statute that the plaintiff's persona be a matter of public interest." (*Id.* at p. 144.)

[4] Plaintiffs also contend that the promissory fraud cause of action was based on Mr. Foreman's allegedly false promise, not on the creation and delivery of the credit sequence. This view of the conduct underlying their promissory fraud claim is unduly constricted; absent the mistaken credit sequence, there would have been no lawsuit. All of plaintiffs' claims ultimately rest on the same underlying conduct.

12

**B.      The second prong:  probability of prevailing on the merits**

In the second step of a SLAPP analysis, we determine whether plaintiffs have produced evidence demonstrating a probability of prevailing on their claims.  We conclude they have not.

The rules are familiar.  To show a probability of prevailing on their claims, " 'the plaintiffs "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." . . . [T]hough the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713-714, citations omitted.)

**1.      Breach of contract and breach of the implied covenant**

To establish a breach of contract, a plaintiff must show "the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and the resulting damages to the plaintiff." (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 433.)  Plaintiffs have failed to show a legally sufficient claim for breach of contract, both because they have not shown a breach and because they have not shown damages.

**a.      The defendants' alleged breach**

Ordinarily, a mistake in the credits, intentional or negligent, would constitute a breach of contract, because the credit agreement was a material term.  (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 847.)  Here, however, the parties agreed that a "casual or inadvertent failure" to comply with the credit requirements would *not* constitute a breach of contract.  Thus, even though the form of producer credits may have "monumental" significance to a producer, the parties agreed that a credit mistake that was not intended or planned does not constitute a breach.  (See www.merriam-webster.com/dictionary [defining "inadvertent" as "not intended or planned" and defining "casual" as "not planned or expected"].)

13

We see no evidence that Mr. Foreman or defendants intended or planned the credit mistake. In our view, the only reasonable inference that may be drawn from the evidence is that the mistake, when initially caught on July 16, 2014, was paid little attention because everyone understood the credit card at that time was just a placeholder. Apparently, the fact the placeholder was inconsistent with the term sheet requirements was not important enough for anyone at the time to believe it was necessary to confirm in writing that it would be corrected, or to merit discussion between Mr. Amin and his production partners. After that, no one caught the error (not even Mr. Amin) until at least three months after the film's January 2015 delivery to IFC Films for U.S. distribution and three weeks before its theatrical release.

Mr. Amin's own testimony proves that defendants made the film available for his viewing many times in the months before the January 2015 U.S. distribution. Mr. Amin testified that he worked closely with Mr. Niccol and the other producers in post-production. He attended an editing room screening on June 13, 2014, and a screening at Creative Artists Agency on July 2, 2014. He gave his notes on three separate cuts viewed online via a secure link between July 15 and July 23, 2014; again from July 29 to August 5, 2014; and again from August 6 to August 13, 2014. He consulted on every aspect of the post-production process, including score, composer, music supervisor and visual effects. He worked closely with Voltage Pictures on its foreign sales and marketing strategy. He worked closely on the promotional trailer for the Cannes film festival and caused it to be re-cut. He attended both the Venice and Toronto film festivals to help promote the film.

Thus, Mr. Amin corroborates Mr. Foreman's testimony that Mr. Amin viewed the film, including the main title credit sequence, several times before its official release. Mr. Amin confirmed that he gave his notes on three separate cuts he viewed online. Apparently, even Mr. Amin failed to notice the mistake in the credit sequence, even when he viewed the film at the Venice film festival.

Plaintiffs insist that one can reasonably infer the *initial* failure to give Mr. Amin appropriate credit was deliberate, and Mr. Foreman's July 16, 2014 statement that it

14

would be fixed was false, from Mr. Foreman's declaration describing industry practice in the negotiation of producer credits. He stated: "It is common practice in the motion picture industry for investors, business representatives, and others to negotiate 'Executive Producer or 'Producer' credit for themselves on a film despite having only a minor role or no role at all in the actual producing work. Accordingly, in exchange for Sobini providing financing for the Film, the Agreement provides that Amin shall be entitled to producer credit as set forth at Paragraph 5(b)." Based on nothing more than these introductory statements in Mr. Foreman's declaration, plaintiffs say it is reasonable to infer that Mr. Foreman did not believe Mr. Amin deserved single-card credit, and therefore intentionally arranged the shared card in the initial rough cut of the film, *and* he had no intention of correcting the credit when he told Mr. Boehm it would be fixed.

We find plaintiffs' proposed inference is quite a stretch, and not a reasonable interpretation of Mr. Foreman's testimony. The assertion Mr. Foreman intended from the outset to deprive Mr. Amin of his single-card credit is sheer argument, unsupported by any direct or circumstantial evidence. There is no evidence Mr. Foreman ever denied that the initial shared card was a mistake, or that he said (or thought) it should not be corrected. His declaration about industry practice was indisputably correct, as was his statement about the negotiation reflected in the term sheet: financing in return for producer credit. (In the term sheet, defendants acknowledged and agreed "that Sobini is committing to purchase a contingent participation from the exploitation of the Picture and to receive certain credits as provided herein.") Indeed, Mr. Amin himself testified the negotiation of the term sheet was "difficult, as it involved identifying our different interests and trading based on those interests." From none of this may we infer Mr. Foreman acted deliberately from the outset to breach the agreement that Mr. Amin would have a single-card producer credit.[5]

---

[5] Plaintiffs also cite an email from Mr. Chartier, sent five minutes after Mr. Amin's May 6, 2015 email stating that his demands were being ignored and he would sue if the correction were not made before release of the film. Mr. Chartier's email ends with the words, "Thanks for never calling us ever again," but appears to concern something else

15

Plaintiffs also contend their breach of contract claim has merit because defendants did not make "reasonable good faith efforts" to prospectively cure the failure after the written notice on April 22, 2015.[6] This contention has no merit.

First, there is no evidence of any expectation in the film industry that an already-distributed film should be recalled to correct credits. No witness testified that defendants should have ceased using the film with the wrong credits or replaced the film before its theatrical release. The term sheet is expressly to the contrary: the agreement stated exactly what defendants had to do when they received written notice of a credit mistake, and specified that "nothing shall require Clear Skies to cease using or to replace prints, negative, advertisements or other materials then in existence." And, it is undisputed that defendants had delivered the film (with the erroneous credit) to IFC Films for distribution in January 2015, and that no copies of the film with the original credit sequence were delivered to any distributors after April 22, 2015. Consequently, there was no breach of defendants' obligation to prospectively cure the credit mistake.

Second, even if we assume an obligation to make reasonable good faith efforts to prospectively correct the credits *and* replace copies that had already been distributed – which there is not in the parties' contract – the evidence would not permit the inference that defendants could and should have done so in the three weeks remaining between April 22 and the May 15, 2015 theatrical release date. Plaintiffs cite testimony from James Masi, president of post-production at Annapurna Pictures, who was asked to estimate the amount of money and time it would take to change the title sequence on the

---

entirely, as the immediately preceding sentences are: "And we're out of moment to remember. Even if tom ruise [*sic*] wants to do it with Blake." Since neither Tom Cruise nor anyone named "Blake" appears to be involved in this film, we see no basis to infer that Mr. Chartier's message concerned this film or Mr. Amin's right to single-card credit.

[6] Plaintiffs also argue that Mr. Foreman's statement that the credit "would be fixed" constituted a waiver by defendants of the requirement of written notice and "of every contractual provision [defendants rely on] to excuse [their] inaction," and that waiver is a question of fact. There is no basis in the record or in law for a finding of waiver.

film to insert a new single card for Mr. Amin's credit.  He testified that he believed it would cost approximately $20,000 "and take at least one week to complete."  However, in addition to the uncertainty of "at least" one week, Mr. Masi's opinion is completely undermined by the fact that he did not even watch the title sequence of the film, instead testifying that the "nature of the current title and credit sequence . . . has been described to me by Cami Winikoff . . . ."  And, Mr. Foreman testified the drone animation that runs through the entire title sequence took the title designer several weeks to create in the first place, and that substantial time was required to recreate the drone animation.  One cannot infer from this evidence an absence of reasonable good faith efforts to prospectively cure the credit mistake.

For the same reasons described above – the absence of a prima facie showing of an intentional contract breach – the evidence does not establish a breach of the implied covenant of good faith and fair dealing.  (See *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395 [a claim for breach of the implied covenant "must show that the conduct of the defendant, . . . demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act"].)

### b.     Damages

In addition to the lack of evidence of any breach of the term sheet, plaintiffs did not show damages.  Their evidence on that point consisted of a declaration from Michael Medavoy, an acclaimed movie producer.  Plaintiffs point to his testimony that "[t]he level of prestige this single card credit affords amounts to both increased possible monetary gain and countless future opportunities," and "[t]he compensation loss from being denied this single card credit could be immeasurable."  But statements about "increased possible monetary gain" and loss that "could be immeasurable" do not constitute evidence that Mr. Amin in fact lost any prestige, opportunities or income resulting from the mistaken credits in this film.  The point is demonstrated in *Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 576, where the court observed that it was "unquestionable that the nonappearance of an artist's name . . . in the form of screen

17

credit on a successful film can result in a loss of . . . valuable publicity." Nonetheless, *Tamarind* observed, "it is clear that any award of damages for the loss of publicity is contingent upon those damages being reasonably certain, specific, and unspeculative." (*Ibid.* [comparing cases where damages from a loss of screen credits "are far too imponderable and ethereal to define in terms of a monetary award" with cases where such damages "can be ascertained (to within a reasonable degree of certainty) if the trier of fact is given sufficient factual data"].) There was no such factual data in Mr. Medavoy's declaration.

By contrast, defendants offered expert testimony that Mr. Amin suffered no harm as a result of the mistaken credit. Jerry Offsay was an entertainment lawyer until he was hired as president of production for RKO Pictures, and he later served in executive positions at ABC Productions and Showtime Networks. He testified the film's theatrical gross as of September 2015 was only $316,472 from 143 theaters. With a production budget between $8.3 and $8.8 million, the theatrical release of the film was plainly a financial failure. While acknowledging Mr. Medavoy's expertise, Mr. Offsay opined that Mr. Amin's compensation loss from being denied single-card credit was measurable, at zero loss. Mr. Offsay opined that, since the film did not perform well, it would not help Mr. Amin's reputation to tout his association with this film, especially since he already had a well-established reputation for successful films.

Mr. Offsay pointed out that plaintiffs do not claim that there was any mistake in the producer credit for Mr. Amin in ads, trailers and promotional packages. "The fact that Amin was a producer on the film is all over the trailer and ads. Moreover, once again, his company, Sobini is prominently featured in the beginning of the film as well as in the trailer and ads." Mr. Offsay also testified "since IFC is the United States distributor for Video on Demand ('VOD'), audiences going forward will see the corrected version with Amin's single card. It is likely that far more people will view the corrected version on VOD, cable television, free television, pay-per-view, DVD, on airplanes, and in hotel rooms than the small number of people who saw the original version which was shown in relatively few theaters."

18

Thus, three titans of the film industry -- Mr. Amin, Mr. Medavoy, and Mr. Offsay -- all agree that producer credits are important, and can have great value in terms of prestige and opportunity. But the dispute over the relative importance to Mr. Amin of the credits in this particular film is immaterial, because neither Mr. Medavoy nor Mr. Amin nor any other witness offered any reasonably certain, specific, and unspeculative evidence of damages, and Mr. Offsay provided an ample factual basis from which to infer no damage was done.

## 2. Promissory fraud

That brings us to the claim for promissory fraud. Plaintiffs' evidence for this claim is, again, the Boehm declaration that Mr. Foreman told him the credit sequence would be fixed and the failure to fix it. (Mr. Foreman testified he had no recollection of the "purported conversation" with Mr. Boehm, but in any event had no intention at any time of inducing Sobini Films or Mr. Amin to forebear taking legal action to ensure Mr. Amin got the proper credit.) Plaintiffs' evidence falls far short of proof of a promise, and does not establish promissory fraud.

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " [Citations.] [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

Here, however, plaintiffs have produced evidence of a statement that the credit sequence would be fixed, and the failure to fix it, but nothing else: most patently, no evidence of fraudulent intent as opposed to negligent failure to correct a mistake. As *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18 tells us, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' . . . [I]f plaintiff adduces no further evidence of fraudulent intent than proof of

19

nonperformance of an oral promise, he will never reach a jury." (*Id.* at pp. 30-31, citations omitted.)  That is precisely the state of the evidence here.

## DISPOSITION

The order denying the motion to strike is reversed.  The trial court is directed to enter a new and different order granting the motion and awarding defendants their attorney fees and costs.  (Code Civ. Proc., § 425.16, subd. (c).)  Defendants shall recover their costs on appeal.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.