Filed 6/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| KIARA BELEN, | B304642 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 19STCV26534) |
| v. | |
| RYAN SEACREST PRODUCTIONS, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michelle Williams Court, Judge. Affirmed with modifications.

Loeb & Loeb, David A. Grossman and Todd J. Densen for Defendants and Appellants.

The Cochran Firm California and James A. Bryant for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Plaintiff, a model, participated in a fashion show that was filmed and aired on television in an episode of the reality series *Shahs of Sunset*. The model never signed a release authorizing or agreeing to be filmed. She sued the show's production and media companies for various causes of action after discovering she was filmed while changing clothes in a dressing area designated for models, and that her "nearly fully nude body had been exposed on national television" during the airing of the show.

Defendant production and media companies filed a special motion to strike the model's complaint as a strategic lawsuit against public participation under the anti-SLAPP statute, Code of Civil Procedure section 425.16. They first argued the model's claims arose from protected activity, that is, the production and broadcast of a television show involving issues of public interest. They next argued she is unlikely to prevail on her causes of action.

While the trial court agreed that the acts complained of constitute protected activity, it denied the special motion to strike, finding that the model had established a probability of prevailing on the merits of her causes of action.

We affirm with one modification.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *Relevant Factual Background*

Kiara Belen (Belen) is a "well-known model" who gained her celebrity status as a runner-up in Cycle 19 of America's Next Top Model. Belen has been a professional runway and print model since 2012—having appeared in commercial print works

2

for designers and participated in fashion shows around the world, including New York Fashion Week and Paris Fashion Week.

Ryan Seacrest Productions, LLC (RS Productions), Ryan Seacrest Enterprises, Inc. (RS Enterprises), Truly Original, LLC (Truly Original), and Bravo Media, LLC (Bravo) are involved in the filming, production, and dissemination of *Shahs of Sunset*—a television series which follows the lives of a group of affluent Iranian Americans living in Beverly Hills. We refer to the entities (RS Productions, RS Enterprises, Truly Original, and Bravo) collectively as appellants.

On October 11, 2016, during Los Angeles Fashion Week, Belen participated as a runway model in a fashion show featuring designer Erik Rosete's (Rosete) clothing line, Mister Triple X. Other celebrity models and television personalities also participated in the show, including former supermodel Janice Dickinson and a cast member from *Shahs of Sunset*, Golnesa Gharachedaghi (GG).

B. *Civil Complaint*

On July 29, 2019, Belen filed a complaint against appellants for intrusion / right to privacy, tortious appropriation of name or likeness, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. She alleged the following in her complaint.

On July 30, 2017, Bravo aired episode 3 of season 6 of *Shahs of Sunset*. Parts of the episode focused on cast member GG participating as a model in Rosete's fashion show during Los Angeles Fashion Week in Fall of 2016—the same fashion show in which Belen participated. "Included in the filming of these scenes, were the female wardrobe changing areas, in which the models undress and change." Belen alleged appellants made

3

"unauthorized uses of [her] likeness in two instances."  First, they showed Belen "changing clothes in a private dressing area designated for the female models in the fashion show, with her nearly completely nude body exposed."  Second, they showed Belen walking down the runway during the fashion show as she is modeling; during this scene, GG's friend and cast member Reza Ferahan (Reza) refers to Belen as "this bitch."

Shortly after the episode aired, Belen was contacted by several friends who inquired whether she was aware she had appeared "naked" on the show.  Belen was "absolutely mortified" to discover that her "nearly fully nude body had been exposed on national television."  Belen had a "reasonable expectation of privacy while she was in the private designated changing area" and "had absolutely no idea she was being filmed by [RS Productions'] crew."  She felt "completely violated."  She was further "objectified . . . in an offensive way" by the comments made by GG's cast member during the scenes in which Belen appeared.

Belen argued appellants' conduct—filming her naked body in a private changing room and disseminating the footage without her consent to millions of people over television and the internet—constitutes a serious invasion of her right to privacy and caused her "severe and extreme emotional distress."  She further argued appellants' acts were "intentional, extreme, and outrageous" and with "reckless disregard of the probability of causing [her] serious emotional distress."

She argued that appellants gained "a commercial benefit or some other advantage" by using Belen's name, likeness, identity, and persona without her consent, causing her emotional and economic harm.

4

She also argued appellants "negligently intruded on [her] privacy" by filming and airing her "nearly naked body to millions of people without her consent." Belen alleged appellants had a duty to exercise reasonable care in the protection of her privacy in dressing rooms "where women were at their most vulnerable." She alleged appellants "breached their duty and were negligent in their actions, misrepresentations, and omissions" by filming her both clothed and nude without her consent and airing footage of her image/likeness without her consent.

She requested the court award her compensatory damages, general damages, special damages, exemplary and punitive damages, restitution, attorney fees and costs, temporary and permanent injunctive relief.

C.    *Special Motion to Strike Belen's Complaint*

On November 12, 2019, appellants filed both their answer and a special motion to strike Belen's complaint as a strategic lawsuit against public participation under the anti-SLAPP statute, citing Code of Civil Procedure[1] section 425.16, subdivision (e)(3) and (4).

In their motion, appellants summarized what took place during the 43-minute-long episode. GG arrives at the Beverly Hilton Hotel conference room that "serve[d] as a staging area for the show." GG drinks champagne to calm her nerves before she walks the runway. Her cast member Shervin Roohparvar (Shervin) "arrives at the hotel conference room and greets GG, reassuring her that she looks good." It is at this point, nearly

---

[1]    Further undesignated statutory references are to the Code of Civil Procedure.

5

18 minutes into the episode, that Belen "appears in the background for one or two seconds when Shervin greets GG."

As for the first incident Belen raised in her complaint, appellants contended she appeared on screen "for less than two seconds" while she was "changing clothes in the background of the conversation between GG and Shervin." They argued what Belen referred to as a "private dressing area" is actually a large, open, conference room at the Beverly Hilton Hotel "where several dozen people including photographers, male and female models, designers, makeup artists, stylists, multiple male [*Shahs of Sunset*] cast members, and hotel staff are seen entering, exiting, and actively moving about the space." The area was far from private, filled with more than a dozen individuals and "with a constant flow of individuals moving in and out of the conference room." Appellants pointed out the production crew for the *Shahs of Sunset* episode had "several large cameras as well as extensive lighting and audio equipment conspicuously set up within the space." The production team had "made an announcement to the room that an episode of the series was being filmed."

As for the second incident, *Shahs of Sunset* cast members are shown seated in the audience, watching as models walk down the runway for the Mister Triple X show. Belen is shown walking down the runway "for less than three seconds." The camera then cuts to Reza and Shervin in the audience, as Reza says, "This bitch knows how to walk." Shortly after, cast member GG is shown walking onto the runway. Belen does not appear in any portion of the episode thereafter.

Appellants stated Belen appears "for approximately five seconds" in the 43-minute-long episode and that her name is never identified or mentioned in the episode. They characterize

the incident as a "fleeting appearance in the background of an episode [of] the *Shahs of Sunset*." They argued her claims "aris[e] from incidental and *de minimis* footage" and should not impair their constitutionally protected right of freedom of speech and expression. Belen's claims "concern oral statements made in the broadcast by cast members as well as the broadcast itself" made available to the public by way of a public forum. They concluded Belen's claims stem from protected activity. In addition, appellants argued the footage at issue depicts cast member GG's attempt to model and is "relevant to GG's storyline." They claimed Belen "herself is proof of the fact that the experience of being a model is an issue of public interest" as she previously gained celebrity status competing in a reality show to become America's Next Top Model.

Appellants also argued RS Productions and RS Enterprises "had no involvement with the filming or [p]roduction of the particular episode at issue in this case." Finally, they contended Belen cannot demonstrate a probability of success on any of her causes of action.

In support of the special motion to strike the complaint, appellants lodged with the court a flash drive including the *Shahs of Sunset* episode in question, which we have reviewed. They also included a sworn declaration by Alan Brooks (Brooks), the production manager at Truly Original. He stated Truly Original was the production company that produced the subject episode, and RS Productions and RS Enterprises were never involved in the filming or production of this particular episode. Truly Original had "received permission" from the hotel and fashion designer Rosete "to film at the time and location of the scenes in question." Brooks stated he was "present at the filming

7

of the fashion show scenes in the [e]pisode" and said the dressing area was not private; it was a conference room at the Beverly Hilton Hotel, which was large and well lit with many people present, including models, designers, photographers, makeup artists, stylists, *Shahs of Sunset* cast members, and hotel staff. Brooks stated the production crew for the series set up large cameras, lights, and audio room. The production team made an announcement to the room that an episode of the series was being filmed, and posted signs indicating the production crew. "At no point in time did any of the models, including [Belen], request not to be filmed or express they were uncomfortable with our presence in any way."

D.    *Belen's Opposition to the Special Motion to Strike*

On January 30, 2020, Belen filed her opposition to the special motion to strike, and argued her causes of action do not arise from acts in furtherance of appellants' rights to free speech on a public issue. She contended videotaping her while she was changing and "her intimate parts were exposed" was a criminal act in violation of Penal Code section 647, subdivision (j)(1) and (4)(A). Belen also argued she established a probability of prevailing on her claims.

Belen's opposition included a declaration, where she alleged: Since 2012, Belen has participated in fashion shows around the world, garnering celebrity model status. In support, she provided a copy of an article from Hollywood Glam Magazine entitled *Mister Triple X Lights LA Fashion Week on Fire!*, where her name was mentioned as one of the celebrity guests.

According to Belen, there were two separate changing rooms at the venue for the models. "Neither of the two changing rooms was accessible to the public, as only authorized personnel

8

was permitted to enter into this segregated area of the venue." The first changing room was a large crowded room filled with models, designers, and hair and makeup technicians. This room remained open and was less private and secure than the second changing room. The second changing room was "located further down the hall in a small secluded enclosed suite, meant for only high profile or celebrity model participants and their guests." The second changing room was "highly secured, as access to entry was granted by a guard outside of the enclosed doors." The second room was "considerably more private and intimate" and there were never more than 15 people in this room at any point in time. In support, Belen provided screen-shots of the episode depicting the two separate changing rooms.

When her friends informed her she appeared "basically naked" on the episode, Belen was "extremely confused" as she was never asked to be filmed, nor gave anyone permission to film her for any *Shahs of Sunset* episode. She argued appellants, being television producers, were "well aware of the fact that it is industry standard to obtain a release from anyone whose likeness you will likely use in your show."

Belen was shocked and "absolutely devastated" when she viewed the episode, as her "private body parts were exposed to the entire world." She felt completely violated. She referred to the part of the episode where Shervin arrives to the dressing room as a guest of GG and exclaims, "I just walked into this room and there are nothing but naked models running around, you know . . . its . . . its so awesome!" After Shervin makes that statement, "the producers of the show specifically identify footage where [Belen is] undressing and down to only [her] underwear, with [her] bare body, including [her] breasts fully exposed."

9

Belen maintained this was not a scene where she "happened to be in the direct background completely blurred out" while GG and Shervin were conversing; she was "featured specifically by the producers of the show to provide visual emphasis" of Shervin's excited exclamation that there were " 'naked models everywhere.' " In support, she provided screen-shots from these specific scenes of the episode.

Belen stated "with one hundred percent certainty" there was never any announcement made to the room about any filming while she there. At no point did Belen see any cameras or signs stating "filming in process." Belen provided screen-shots of various scenes from the episode which show the changing room at different angles, none depicting any signs that filming was in progress. Regardless, "even assuming that [Belen] did realize there was a videographer in the room, it would be beyond all standards to film female models while their bare bodies are exposed."

The show's "sexual exploitation" of Belen's body was "extremely painful" to her for two reasons: First, she had undergone years of therapy following a sexual assault in 2014. Upon seeing the episode, Belen became nauseous: "Once again my power over my body was stripped from me to be exposed to hundreds of thousands if not millions of people I didn't know" and "brought up the pain of [her] sexual assault." Second, Belen was four months pregnant at that time and her body "was undergoing serious changes." She felt sickened that the show's producers exploited her pregnant body.

As a result of the emotional distress she suffered from appellants' acts, Belen suffered sleepless nights and was "in a perpetual state of nausea and serious anxiety" that caused her to return to therapy.

E.  *Trial Court's Ruling*

On February 14, 2020, the trial court denied the special motion to strike Belen's complaint.

This appeal timely followed.

## DISCUSSION

A.  *Standard of Review*

We review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)  "In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted."  (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652.)

As always, "our job is to review the trial court's ruling, not its reasoning."  (*People v. Financial Casualty & Surety, Inc.* (2017) 10 Cal.App.5th 369, 386.)  We consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  (§ 425.16, subd. (b)(2).)  In considering the pleadings and declarations, we do not make credibility determinations or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has

11

defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).)

B.      *Applicable Law*

Section 425.16 provides "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)  An " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' " is defined in section 425.16 to include, in relevant part:  "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "any other conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest."  (*Id.*, subd. (e)(3) & (4).)

The Legislature enacted section 425.16 to prevent and deter "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."  (§ 425.16, subd. (a).)  The purpose of the anti-SLAPP law is "not [to] insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity."  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)  Section 425.16, subdivision (a) provides this statute "shall be construed broadly."

12

When a party moves to strike a cause of action (or portion thereof) under the anti-SLAPP law, a trial court evaluates the special motion to strike by answering two questions: (1) has the moving party "made a threshold showing that the challenged cause of action arises from protected activity" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056); and, if it has, (2) has the non-moving party demonstrated that the challenged cause of action has " 'minimal merit' " by making "a prima facie factual showing sufficient to sustain" a judgment in its favor? (*Baral, supra,* 1 Cal.5th at pp. 384–385; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 93–94; see also § 425.16, subd. (b)(1)). If the first prong is satisfied by the moving party, the burden then shifts to the non-moving party to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. (*Baral*, at p. 396.)

C.     *Prong 1*: *Arising from Protected Activity*

Appellants argue Belen's claims arise from the production and broadcast of an episode of *Shahs of Sunset*, which they contend is protected activity. We agree.

The claims in Belen's complaint arise out of and are based on appellants' acts of filming, producing, and airing portions of a fashion show as part of episode 3 of season 6 of the *Shahs of Sunset* series. Belen's claims also arise out of oral statements made by the series cast-members (Shervin in the first instance, and Reza in the second instance) about Belen, which was also part of the same episode broadcast to the public.

It has long been accepted that the "creation of a television show is an exercise of free speech." (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*).) The First Amendment of the United States Constitution protects

13

the creative elements of an artistic work.  (See *Winter v. DC Comics* (2003) 30 Cal.4th 881, 891–892.)  " '[T]he creative process must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried, and, in the end, either discarded or used. . . .  [¶] . . . We must not permit juries to dissect the creative process in order to determine what was necessary to achieve the final product . . . .  Creativity is, by its nature, creative.  It is unpredictable.  Much that is not obvious can be necessary to the creative process.' " (*Tamkin*, at pp. 144–145, italics omitted.)  Here, appellants' acts in helping "to advance or assist in the creation, casting, and broadcasting of an episode of a popular television show" constitutes an act in furtherance of appellants' right of free speech.  (*Id*. at p. 143.)  It is undisputed that this episode was broadcasted on a cable-TV network to hundreds of thousands, if not millions, of viewers, which qualifies as dissemination in a place open to the public or in a public forum.

Appellants must also establish that their acts—which form the subject of Belen's complaint—were in connection with a public issue or an issue of public interest.  (See § 425.16, subd. (e).)  While section 425.16 does not define the term "public interest," it does instruct us to construe the statute broadly and provides that "it is in the public interest to encourage continued participation in matters of public significance." (*Id*., subd. (a).)  Further, an issue of public interest is any issue in which the public is interested, and the issue need not be significant to be protected by the anti-SLAPP statute.  (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039; see *Tamkin*, *supra*, 193 Cal.App.4th at p. 143.)  Here, the portions of the episode in question depict cast member GG as she prepares for her modeling

14

gig at the Mister Triple X fashion show, feels anxiety about falling on the runway, and compares herself to the professional models surrounding her. Appellants assert this specific footage is relevant to GG's storyline in the episode and that the experience of being a model is an issue of public interest. We agree. Belen herself declared she gained celebrity status by participating in a reality show to compete for the title of America's Next Top Model. The daily lives, experiences, and struggles faced by models constitute an issue of public interest, as defined by *Nygård*. "[T]he public interest in the subject matter of the program gives rise to a constitutional protection against liability." (*Dora v. Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 542 (*Dora*).)

In her brief, Belen "does not disagree that the creation of the television episode in question is an exercise of free speech, and will often constitute protected activity"; she argues, however, that "such protections should not and do not extend to the whole of the 'artist's expression' where certain elements of that expression cross the lines of protected expression, and enter a realm where no such protections exist." To this end, she argues appellants' acts—i.e., "the taking and dissemination of nude images of a person without their consent"—violate Penal Code section 647, subdivision (j)(4), and are not protected by the anti-SLAPP statute. Relying on *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*), she contends illegal speech/conduct cannot suddenly be afforded such protections, merely because such conduct is incorporated into an expression that is a protected activity.

It is true that the *Flatley* court held the anti-SLAPP statute cannot be invoked by a defendant who claims that the plaintiff's cause of action arises from assertedly protected activity when

15

that activity is *illegal as a matter of law* and, for that reason, not protected by the constitutional guarantees of free speech and petition. (*Flatley*, *supra*, 39 Cal.4th at p. 317.) However, this holding was limited to section 425.16 proceedings where "either *the defendant concedes, or the evidence conclusively establishes*, that the assertedly protected speech or petition activity was illegal as a matter of law." (*Id.* at p. 320, italics added.) Illegal conduct as a matter of law under *Flatley* must be based on a defendant's concession or on uncontroverted and conclusive evidence—neither of which is present at this stage of the proceedings. (See *ibid.*) Appellants have not conceded that their conduct was illegal, and Belen has not conclusively proven that appellants' conduct was illegal as a matter of law. Brooks' sworn declaration states Truly Original had "received permission" from the hotel and fashion designer Rosete "to film at the time and location of the scenes in question." Given that fact, Belen has not conclusively established with uncontroverted evidence that appellants' acts were taken to "intentionally" distribute images of her body as prohibited in Penal Code section 647, subdivision (j)(4)(A).

D.     *Prong 2*: *Probability of Prevailing on the Claims*

The burden now shifts to Belen to show minimal merit, i.e., a probability of prevailing on her causes of action. We conduct an inquiry into whether Belen stated "legally sufficient" claims and made a "prima facie factual showing" with competent, admissible evidence sufficient to sustain a favorable judgment on each of the challenged causes of actions. (*Baral*, *supra*, 1 Cal.5th at pp. 384-385; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) The moving party "may not rely solely on its complaint . . . ; instead, its proof must be made upon competent admissible

16

evidence." (*San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 95.)

We reiterate that we do not make determinations as to credibility or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup, supra,* 39 Cal.4th at p. 269, fn. 3.)

Preliminarily, we address appellants' argument that Belen cannot show a probability of prevailing against RS Productions and RS Enterprises on *any* of her causes of actions because those entities "did not commit any of the alleged torts" and were not involved in the production and filming of the episode. Appellants rely on the declaration of Truly Original's production manager, Brooks, who stated at no point were RS Productions and RS Enterprises involved in the "filming or production" of this particular episode. However, Brooks' declaration does not defeat Belen's opposition and evidence *as a matter of law*. "A defendant's declaration denying that he or she engaged in the conduct alleged in the complaint does not foreclose the possibility that a fact finder could later find that he or she did in fact engage in that conduct. Foreclosing an anti-SLAPP motion based upon one version of the facts would irrationally and unfairly disregard this possibility." (*Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 939.)

Belen alleged in her complaint that all named entities were in some manner responsible for the events and happenings described and proximately caused injury and damage to her. She specified that RS Productions, RS Enterprises, and Truly Original produce the *Shahs of Sunset* series, and that the series

17

is aired on the cable-TV network Bravo TV, which is owned and operated by Bravo. While appellants are correct in that Belen did not specify in her sworn declaration (in support of her opposition to appellants' special motion to strike) in what capacity each of the named entities were involved in the production, filming, and broadcasting of the episode, we find she did not have to. The evidence provided, i.e., the *Shahs of Sunset* episode itself, identifies involvement by RS Productions, Truly Original, and Bravo Media Productions between the 43:16 and 43:24 minute marks. Ryan Seacrest was identified at the beginning of the episode as the executive producer; Ryan Seacrest is the chief executive officer of RS Enterprises.[2] Furthermore, while Brooks stated in his declaration that RS Productions and RS Enterprises were not involved in the "filming or production" of this episode, Brooks' declaration provided no evidence or information as to whether the two RS entities were involved in the *distribution* and/or *dissemination* of this episode. Thus, the evidence in the record sufficiently shows that all of the defendants named in Belen's complaint were involved in some degree in the production and/or distribution of the show/episode; no evidence produced by appellants defeat Belen's evidence (that all named defendants were involved to some degree) *as a matter of law*. (See *Wilbanks*

---

[2] Per Evidence Code section 452, subdivision (c), we judicially note the Statement of Information filed with the California Secretary of State that provides Ryan Seacrest is the chief executive officer, secretary, and chief financial officer of RS Enterprises. (See *Elmore v. Oak Valley Hospital Dist.* (1988) 204 Cal.App.3d 716, 722 [a statement filed with the Secretary of State becomes a document of which a court can properly take judicial notice].)

18

*v. Wolk* (2004) 121 Cal.App.4th 883, 905 [consideration of a defendant's opposing affidavits does not permit a weighing of them against plaintiff's supporting evidence, but only a determination that they do not, as a matter of law, defeat that evidence].)

Finally, the case summary in the record provides that all four named defendants, including RS Enterprises and RS Productions, answered the complaint on November 12, 2019.  If the RS entities were erroneously named in the action, they should have pursued a demurrer or a motion for summary judgment.  (See *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at p. 905 ["A motion to strike under section 425.16 is not a substitute for a motion for a demurrer or summary judgment."]

At oral argument, appellants relied on the following three cases, none of which we find dispositive as they are factually distinguishable.

In *Wong v. Jing* (2010) 189 Cal.App.4th 1354 (*Wong)*, dentist Wong filed a complaint for libel and intentional and negligent infliction of emotional distress against Jing and his wife Ma for allegedly making false claims in a review posted on Yelp.com (Yelp) criticizing dental services Wong provided to Jing and Ma's young son.  (*Id.* at pp. 1359–1360.)  Jing and Ma filed an anti-SLAPP motion to strike Wong's complaint; they claimed Wong could not show a probability of success on her claims.  (*Ibid.*)  Wong opposed the motion.  (*Id.* at p. 1362.)  As part of their reply, Jing provided a declaration stating that he wrote and posted the review on Yelp without Ma's knowledge.  (*Id.* at p. 1363.)  Ma provided a declaration where she stated she did not write or know about the review posted by Jing.  (*Ibid.*)  The trial court denied the anti-SLAPP motion; it acknowledged Jing's and

Ma's declarations concerning Ma's non-involvement but noted the issue was raised in their reply, precluding Wong the benefit of discovery to controvert them. (*Id*. at pp. 1363–1364.) Under the circumstances, the court found the declarations did not establish Ma's non-liability. (*Id*. at p. 1364.) The Court of Appeal disagreed, however, and directed the trial court to dismiss all causes of action against Ma, as there was "no evidence, admissible or otherwise, suggesting that Ma had anything to do with the review and its posting." (*Id*. at p. 1368.) Unlike Ma's case in *Wong*, however, there was evidence here connecting the RS entities to the actions complained of by Belen in her civil complaint. Further, we did not receive any declarations from RS Enterprises or RS Productions denying any and all involvement with the filming, production, and broadcast/dissemination of the *Shahs of Sunset* episode containing footage of Belen. And as already noted, the declaration from the production manager at Truly Original only denied the RS entities' involvement in the filming and production but not the dissemination and broadcast of the episode/footage.

Appellants' reliance on *Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882 (*Abir*) fails for similar reasons. In *Abir*, a law firm sued their former client's daughter Arta for defamation for leaving negative reviews about the firm on Yelp, Avvo, and the firm's Facebook page. (*Id*. at pp. 885–886.) Arta filed an anti-SLAPP motion seeking dismissal of the defamation claim on the grounds that the law firm could not establish the requisite minimal merit. (*Id*. at p. 886.) In support, she provided a declaration stating she did not post any of the reviews; she also provided a sworn declaration from her mother Nahid (the law firm's former client) who attested that she (Nahid) left the

20

reviews. (*Ibid*.) The trial court ruled the law firm had not carried their burden of showing their defamation claim had minimal merit because their assertion that Arta posted the online statements was speculative and not supported by the evidence in the record. (*Id*. at p. 887.) The Court of Appeal independently agreed with the trial court's conclusion that the law firm did not make a prima facie showing that Arta was legally responsible for the postings underlying their defamation claim, as the "posts themselves do not establish that Arta was the author or poster, as none of the posts are in Arta's name and their content suggests that the author was the one represented by . . . the firm—that is, Nahid." (*Id*. at p. 889.) As already explained, the same cannot be said in the case before us, as there was evidence that each of the appellants were involved in some degree with the filming, production, and/or distribution of the episode.

Appellants next relied on *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, which is inapposite as it analyzes the element of publication in the context of a libel claim. The Court of Appeal in that case found Matson's cause of action for libel was properly stricken by the trial court because Matson made no showing that Dvorak had a responsible role in the publication of the campaign literature that Matson claims was defamatory. (*Id*. at p. 542.) The general rule for defamation is that only one who takes a *responsible* part in the publication is liable for the defamation. (*Id*. at p. 549.) The Court of Appeal determined that Dvorak's contribution of $999 to a political campaign cannot subject him to liability in a defamation action for statements contained in a publication by that political campaign when Dvorak was not involved in the preparation, review, or publication of the

21

campaign literature.  (*Id*. at pp. 542, 549.)  The issue there was whether Matson made a sufficient showing that Dvorak was involved in the *publication* at issue (*id*. at p. 548), where as here, appellants only argue that the RS entities were not involved in the filming or production.  And, Belen's complaint did not even include a cause of action for libel/defamation.

We have viewed the episode at issue and now turn to each of the causes of action.

### 1.    Intrusion/Invasion of Privacy

The common law tort of invasion of privacy by intrusion has two elements:  (1) intrusion into a private place, conversation, or matter, (2) in a manner highly offensive to a reasonable person.  (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 231.)  Belen must show appellants "penetrated some zone of physical or sensory privacy surrounding" her and that she had an objectively reasonable expectation of privacy.  (*Id*. at pp. 231–232.)

Belen provided evidence that she was assigned to the second dressing room, meant for celebrity models such as herself. The various screen-shots of the episode show there were two different dressing rooms, and that the second dressing room was more private and much less crowded than the first dressing room. The screen-shots also show there was a security guard standing outside the door to the second dressing room, allowing access to authorized persons only.  The episode footage shows Belen as she undressed in the second, more private dressing room, and further shows her almost fully naked, her breasts exposed (with small blurs covering the areola of her breasts), wearing only underwear.  She provided evidence that she had a reasonable expectation of privacy that she would not be filmed while nude

22

with her intimate body parts exposed while changing clothes in a private dressing room. That the room was guarded supports a reasonable expectation that the room was not open to, and was protected from, those not properly involved in styling, dressing, and undressing the models within.

Belen also provided evidence that the filming was done without her knowledge or consent, as she did not hear any announcement made that filming was in progress and did not see any signs in the vicinity announcing that she was subject to filming. The footage of her nearly completely naked body broadcast and "exposed [her] to hundreds of thousands if not millions of people [she] didn't know," causing her severe emotional distress, sleepless nights, nausea, and requiring her to return to therapy.

Belen has shown a probability of success on her first cause of action for invasion of privacy.

2. Tortious Misappropriation of Name or Likeness

A cause of action for common law misappropriation of name or likeness is pleaded by alleging: " ' "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." ' " (*Maxwell v. Dolezal* (2014) 231 Cal.App.4th 93, 97.)

We find Belen has submitted evidence for the first, third, and fourth elements, for the same reasons discussed in the preceding section on intrusion. As to the second element, even though Belen's name was never identified or used throughout the episode, her face and nearly nude body are shown while in the dressing room. Appellants do not contest that Belen is a public figure. It is undisputed she is a well-known model who gained

23

celebrity status as runner-up in America's Next Top Model and has served as a professional runway and print model since 2012. Belen provided evidence that footage of her nearly nude body was also used as material for the preview clips promoting and advertising the episode on the website. While use of Belen's runway walk does not constitute common law misappropriation (see *Dora, supra*, 15 Cal.App.4th at p. 542 [the public interest in the subject matter of the program gives rise to a constitutional protection against liability]), the filming and use of Belen's face and nearly nude body constitute appropriation of Belen's likeness to appellants' advantage (see *ibid*. [celebrities and noncelebrities have the right to be free from the *unauthorized* exploitation of their likeness]).

Belen has established a probability of prevailing on her second cause of action.

### 3.     Intentional Infliction of Emotional Distress Claim

A cause of action for intentional infliction of emotional distress requires:  1) extreme and outrageous conduct by appellants with the intention of causing, or reckless disregard of the probability of causing, emotional distress; 2) severe or extreme emotional distress; and 3) actual and proximate causation of the emotional distress by the appellants' outrageous conduct. (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486.) Conduct is considered outrageous when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Ibid*.)

24

Belen provided evidence that appellants' videotaping and broadcasting footage of her while she was undressed and changing in the dressing room, without her consent, caused her to suffer severe emotional distress. She explained how appellants specifically cut to footage of her naked in her underwear while changing clothes, with only the areolas of her breasts blurred out, in conjunction with cast member Shervin exclaiming "I just walked into this room and there are nothing but naked models running around, you know . . . its . . . its so awesome!" Having watched the episode, we disagree with appellants that Belen's appearance was *de minimis* and that she was merely in the background while GG and Shervin conversed. We agree with Belen that she was featured specifically by the producers of the show to provide a visual emphasis of Shervin's exclamation of "naked models everywhere." That appellants wanted a visual emphasis is brought home by the fact that they did not blur out Belen's entire breasts, only the areolas. Appellants intentionally or recklessly exploited Belen's intimate body parts for their own purposes. The first element is satisfied.

Belen's sworn statements establish the second and third elements for intentional infliction of emotional distress. She stated she suffered emotional distress as a result of appellants' acts, resulting in sleepless nights and "a perpetual state of nausea and serious anxiety." She explained how the show's filming and airing of her nearly fully naked pregnant body caused her extreme pain and required therapy as it "brought up the pain of [her] sexual assault."

Belen has shown a probability of success on her third cause of action.

4. <u>Negligence / Negligent Infliction of Emotional Distress Claim</u>

Belen alleged both negligence and negligent infliction of emotional distress as the last two causes of actions on her complaint.  However, there is no independent tort of negligent infliction of emotional distress.  (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984.)  "The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element." (*Ibid*.)  "A claim of negligent infliction of emotional distress is not an independent tort but the tort of negligence to which the traditional elements of duty, breach of duty, causation, and damages apply."  (*Wong*, *supra*, 189 Cal.App.4th at p. 1377.)  The trial court agreed and found "there is no tort of negligent infliction of emotional distress" and proceeded to analyze Belen's negligence claim.  However, the trial court neglected to strike the cause of action for negligent infliction of emotional distress.  We modify the judgment in that respect and strike that cause of action because no such independent tort exists.

As for negligence, Belen declared that appellants, as television producers, were "well aware of the fact that it is industry standard to obtain a release from anyone whose likeness you will likely use in your show."  She argues it is industry standard that photographers who have access to fashion show changing rooms are not permitted and do not shoot or film models when they are changing and their bodies exposed. Although appellants may have been granted permission by the hotel and fashion designer to film in the designated areas, Belen established appellants still had a legal duty to disclose to her that they are filming her in the guarded, more private dressing room, so that she could deny them permission to film her or avoid being

26

filmed when unclothed. While Brooks stated in his declaration that an oral announcement was made, Belen stated "with one hundred percent certainty" there was never any announcement made in the second room about any filming and that she did not see any cameras or signs stating "filming in process." Belen provided screen-shots from the episode that showed the second dressing room at different angles; there were no signs stating "filming in progress."

Our State Supreme Court has made clear that "to recover damages for emotional distress on a claim of negligence where there is no accompanying personal, physical injury, the plaintiff must show that the emotional distress was 'serious.' " (*Wong*, *supra*, 189 Cal.App.4th at p. 1377.) Moreover, serious emotional distress may be found where a reasonable person would be unable to adequately cope with the mental stress engendered by the circumstances of the case. (*Id*. at pp. 1377–1378.) Having one's nearly fully naked body filmed and broadcast on television and the internet, without consent or knowledge, would cause any reasonable person, model or not, to suffer serious emotional distress. We find Belen had shown the sort of serious emotional distress with which a reasonable person would be unable to cope.

Belen has established a probability of prevailing on the cause of action for negligence.

As a final note, both parties argue they are entitled to recover attorney fees on appeal. (See *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1446.) This issue is properly determined by the trial court upon appropriate motion by the prevailing party.

27

## DISPOSITION

The order denying appellants' special motion to strike the complaint is affirmed, as modified:  the separate cause of action for negligent infliction of emotional distress is stricken from the complaint, as it is part and parcel of the negligence cause of action.

Respondent Belen is awarded costs on appeal.

**CERTIFIED FOR PUBLICATION**


STRATTON, J.

We concur:



BIGELOW, P. J.



WILEY, J.

28